ALBANY,
August, 1822.

DE WOLF
v.
NEW-YORK
FIRE. INS. CO.

DE WOLF *against* The NEW-YORK FIREMEN INSURANCE COMPANY.

*Insurance, by the defendants, on a cargo, at and from New-York to Havanna, and, at and from thence to Laguira, and Porto Cabello, or either of them, at a premium of seven per cent., to return five and a quarter per cent. if the risk ended at H., without loss, or two per cent. if only one of the two other ports was used, and the risk ended without loss: warranted American property. The cargo, consisting of flour and pork, was purchased of the*

THIS was an action on a policy of insurance, dated *July* 21, 1818, " on the cargo of the brig *George Washington*, at and from *New-York* to *Havanna*, and at and from thence, to *Laguira* and *Porto Cabello*, or either of them, at a premium of *seven per cent.*, to return *five and a quarter per cent.*, if the risk ended at *Havanna*, without loss, or *two per cent.*, if only one of the two last mentioned ports was used, and the risk should end without loss." It was an open policy, and subscribed for the sum of twenty thousand dollars, and was in the usual printed form, with a written note or *memorandum* subjoined, that the property insured was *warranted* by the assured to be *American* property.

The cause was tried at the *New-York* Sittings, the 16th of *December*, 1820, before Mr. Justice *Van Ness*. It was proved that the plaintiff was a native *American* citizen, and before and at the time of effecting the insurance, was, and still is a merchant, residing in the city of *New-York*: that in *July*, 1818, a negotiation was entered into between the plaintiff and *Moses E. Levy*, a merchant, resident at *St. Thomas*, but then in the city of *New-York*, about the

plaintiff, a native *American* citizen, residing in *New-York*, by *L.*, a *Danish* citizen of *St. Thomas*, then in *New-York*, under a contract entered into here, by which the plaintiff agreed to deliver the cargo to *L.*, at *Havanna*, or at *Laguira*, or *Porto Cabello*, at *five* per cent. advance on the invoice, or cost, paid by the plaintiff, and the freight, and premium of insurance, paid by the plaintiff. The cargo was consigned, by the plaintiff, to *Spanish* merchants, at *Havanna*, (designated by *L.*) with instructions to dispose of the cargo, for the plaintiff's account, &c. or to send it to another market, that is, to a windward port. The *bill of lading* expressed, that the cargo was shipped for the account and risk of the plaintiff, to be delivered at *Havanna*, to *H. & C.* or their assigns, paying no freight, it being the property of the owner of the vessel : On the arrival of the vessel at *Havanna*, the consignees interlined the bill of lading with the words, " or a market ;" and directed the master to proceed to *Laguira*; and while proceeding to *Laguira*, the vessel was captured, near that place, by a *Venezuelan privateer*, and carried into a port in the island of *Margarita*, and the vessel and cargo libelled in the Admiralty Court there, and the *cargo* condemned as prize, &c.

In an action on the policy to recover for a total loss : *Held*, that the cargo was, and remained the property of the plaintiff, until its delivery at one of the ports mentioned ; that there was no delivery, or acceptance of it, at *Havanna*; and that the consignees there, in directing the master to proceed to *L.*, acted as agents of the plaintiff, who continued to be, and was the owner of the cargo, at the time of its capture ; and that, therefore, the *warranty* was complied with.

That such a contract of sale is legal and valid, both by the municipal law of this country, and by the law of nations, and does not destroy the *neutral* character of the property.

That the plaintiff was not bound to disclose to the defendants the fact and circumstances of the contract ; for even if they were material, yet the insured is not obliged to communicate any fact, as to which there is a *warranty*, express or implied.

plaintiff's loading two vessels at *New-York*, on his own account, and delivering their cargoes at *Havanna*, *Laguira*, or *Porto Cabello*, to be paid for by *Levy*, on their delivery. This negotiation resulted in an agreement, the terms of which were contained in two letters, each bearing date the 21st *July*, 1818. The first letter was from *Levy* to the plaintiff, as follows : " I am desirous of purchasing of you, deliverable in *Havanna*, *Laguira*, or *Porto Cabello*, a certain quantity of beef, pork, flour, peas, &c. and will contract with you, on the following terms ; for a cargo of beef, &c. to be shipped by the brig *Warrior*, and a cargo of flour, to be shipped by the brig *George Washington*, to *Havanna* or *Laguira*, I will pay you the amount of the costs and charges, including the cost of insurance which you shall pay thereon, and five per cent. advance on the amount of invoice, for your profit, together with one dollar per barrel, freight, if delivered at *Havanna*, or two dollars and fifty cents per barrel, if delivered at *Laguira* or *Porto Cabello*." The answer of the plaintiff to this letter, was as follows : " I have received your letter, and I agree to your proposal to deliver you the cargoes of the *Warrior* and the *George Washington*, at *Havanna*, or a port to windward, at the cost and charges, as paid, and five per cent. advance on amount of invoice, together with one dollar per barrel, freight ; and in case that one or both should go to *Laguira* or *Porto Cabello*, an additional freight of one dollar and fifty cents per barrel ; fifteen running days to be allowed for discharging the cargoes at *Havanna*, and twenty-five running days for all ports if they proceed to windward." It appeared that *Levy* had made a contract with the intendant at *Havanna*, to supply the government at *Havanna*, *Laguira*, and *Porto Cabello*, with provisions like those of the cargo of the *George Washington ;* and for that purpose, he came to the *United States*, and made, among others, the contract with the plaintiff ; but *Levy* did not communicate to the plaintiff, nor did the plaintiff know of the contract between him and the intendant of *H.* The *George Washington*, of which the plaintiff owned two thirds, and *Noah Pratt* the other third, was laden with a cargo of flour and pork, and the master, on the 5th of *August*, 1818, signed bills of

lading, stating that the plaintiff had shipped, &c. the flour and pork, to be delivered at the port of *Havanna*, to *Hernandez and Chauviteau*, or their assigns, paying no freight, the same being the property of the owner of the vessel. The invoice which accompanied the cargo, stated that it was shipped by the plaintiff, on board the brig *George Washington*, for *Havanna*, for account and risk of the shipper, a citizen of the *United States*, and consigned to Messrs. *Hernandez and Chauviteau*. It appeared that *H. & C.* were the persons designated by *Levy* to be the consignees of the cargo at *Havanna*, and had his instructions relative to it, and to whom the cargo was to be delivered at *Havanna*, or was by them to be ordered to be delivered at *Laguira* or *Porto Cabello*. Before the vessel sailed, the plaintiff addressed a letter of instructions to the master, signed by *F. G. Bull*, his authorized agent for the purpose, in which he directed him to proceed to *Havanna*, and on his arrival there, address himself to *Hernandez and Chauviteau*, who would either receive the cargo, or if they thought best for his interest would direct the master to proceed to some other market to windward ; and if the brig was discharged at *Havanna*, he was to advise with *H. & C.* as to procuring the best freight for *Europe* or the *U. S.* &c. The plaintiff, also, wrote a letter to *Hernandez and Chauviteau*, which was delivered to the master, in which he mentions the shipment to them of the cargo of flour and pork, amounting to 17,853 dollars ; and requesting them to receive and dispose of the same to the best advantage for his account ; and that in case they thought it best for his interest, to send the vessel to any other market, that is, to windward, they might do so ; but in that case, they must calculate that the cost of the flour would be augmented one dollar and fifty cents for freight, and eight per cent. for insurance. That the shipment was made by the advice of their mutual friend Mr. *Levy*, and he hoped that it would prove satisfactory, and come to a good market. That in case the vessel discharged at the *Havanna*, they were requested to consult with the master, as to procuring a freight for *Europe* or the *U. S.* preferring the latter ; and to furnish the master with money sufficient to pay his expenses, and take his bill on the plain-

tiff for the amount. If the vessel discharged at *H.* and no freight could be procured for the *U. S.*, and a cargo of molasses, or part of a cargo, could be purchased at eight reals per keg, they were requested to make the purchase, after taking what freight could be obtained, drawing on him for the amount ; and if no freight could be procured, he was willing to go as high as nine reals per keg for molasses. These letters were shown to Mr. *Levy* at the time they were written, and before they were delivered to the master.

The *G. W.* arrived at *Havanna* about the 10th of *September*, 1818, where she remained about two days, without delivering any part of her cargo. The letter addressed by the plaintiff to *H. & C.* was delivered to them ; and they directed the captain to proceed with the vessel and cargo to *Laguira*. While at *Havanna*, one of the clerks of *Hernandez and Chauviteau*, in the presence of Captain *Pratt*, inserted in the body of the bill of lading, after the words "port of *Havanna*," the words " or a market;" and the following indorsement was made on the same bill of lading : " Deliver the contents within to Mr. *Gerardo Patrullo ;* ordered the brig to proceed, not finding a favourable sale of the cargo at *Havanna.—Havanna*, 11th of *September*, 1818. *Hernandez and Chauviteau.*" Two letters were written at *Havanna*, by *Hernandez and Chauviteau*, one addressed to *Gerardo Patrullo*, at *Laguira*, and the other to *Jose Beneto de Austria*, at *Porto Cabello*, both dated the 10th of *September*, 1818. A translation of the first letter was as follows : " The *American* brig *George Washington*, Captain *Noah Pratt*, has just arrived here with a cargo of flour and pork, consigned to us by Mr. *James De Wolf*, jun. Being unwilling to detain her here, on account of the low prices of those articles, we send her to the *Spanish Maine*, in search of a better market ; and in the event of her arrival at your port, permit us to recommend to you her captain, Mr. *Noah Pratt*, whom we have furnished with your address. If the flour and pork can be disposed of, in any way, at your place, that circumstances will permit, it will not be for the interest of our friend, Mr. *J. De Wolf*, to let the vessel return to the *United States* in ballast. In case you should be under the necessi-

ty of taking bills in payment for the flour, in that event, we open with you a credit in the sum of ten thousand hard dollars, to be invested in hides and other articles that may yield a freight; authorizing you to draw for the above sum of 10,000 hard dollars, on account of Mr. *James De Wolf*, jun. merchant, of *New-York*, which drafts will be duly honoured, and for the punctual payment whereof, we hold ourselves responsible." " P. S. The credit for the 10,000 dollars will not be resorted to, unless no freight can be had for the brig." Signed " *Hernandez and Chauviteau.*" The other letter, addressed to *Jose Beneto de Austria*, at *Porto Cabello*, was the same in substance. These letters were delivered to Captain *Pratt*. The brig sailed from *Havanna* about the 12th of *September*, 1818, and on the 12th of *October* following, was captured, in sight of *La-guira*, by the schooner *Brutus*, a private armed vessel, of the republic of *Venezuela*, and carried into the port of *Juan Griego*, in the island of *Margarita*, where she arrived on the 19th of *October*. The vessel and cargo were both libelled in the vice admiralty Court of that island; and on the 24th of *October*, the cargo was condemned as good prize, and the vessel acquitted.(*a*)		On receiving in-

(*a*) The sentence of condemnation (which was translated,) is dated at *Villa del Norte*, the 24th day of *October*, 1818, and in the eighth year of the republic of *Venezuela*, and declared as follows: "That having carefully examined the documents which *Noah Pratt*, captain of the said vessel, has exhibited, it is found, that she, and the cargo, came from *New-York*, and belong to *James De Wolf*, jr. who consigned the same to Messrs. *Hernandez and Chauviteau*, in the island of *Havanna*; but observing, on the other side, that from thence she was despatched, for the account and risk of those persons, to *La-guira*, the said cargo being consigned to Don *Gerardo Patrullo*, or, to *Porto Cabello*, to Don *Beneto Austria*, as property belonging to *Hernandez and Chauviteau*, as is proved by the indorsement on the back of the bill of lading, and the words ' or a market,' which are surreptitiously inserted; by the letters, in which appears a bill of exchange of ten thousand dollars, upon *Patrullo and Austria*, for her return, and a special recommendation respecting the cargo, all of them being acts without the orders, and done when out of the reach of *James De Wolf*, jr. by *Hernandez and Chauviteau*, and by the clerk of the house, as the said Captain *Pratt* declares, when the said bill of lading was produced to him; all which is corroborated by the deposition of *Henry Wilson*, chief mate of the said *George Washington*; so that on all sides the truth is discovered, that the cargo that she had on board was the property of *James De Wolf*, jr., until she arrived at the port of *Havanna*, and then commenced to be that of Messrs. *Hernandez and Chauviteau*, by whose orders, and not by those of *James De Wolf*, it was exposed to the perils of the

formation of the capture, the plaintiff abandoned the cargo to the defendants, and claimed a total loss.

A verdict was taken for the plaintiff, for twenty-five thousand dollars, subject to adjustment, and to the opinion of the Court, on a case as above stated : and either party was to be at liberty to turn the case into a bill of exceptions or special verdict.

*Wells,* for the plaintiff.   1. Has the warranty of *American* property been complied with in this case ?   The contract between the plaintiff and Mr. *Levy,* was a valid contract at common law, and by the law of nations ; most certainly, in a state of peace.   But it will be objected, that as war existed between *Spain* and her colonies, this is to be considered and treated as a contract in time of war.   Sir *William Scott,* in the case of the *Packet de Bilboa,* (2 *Rob. Adm. Rep.* 133.) admits, that in time of peace, there would be nothing unlawful in the consignor taking upon himself the whole risk of the goods, until delivered to the consignee. But, " in time of war," he says, " this cannot be permitted, for it would at once put an end to all captures at sea ;" because it would be a contrivance resorted to, for the purpose of protecting property from capture, " in all consignments from neutral ports to the enemy's country, to the manifest defrauding of all rights of capture."   And because it *may* be used as an instrument of fraud, he comes to the very illogical conclusion, that it, therefore, is to be considered as an invalid contract in time of war ; thus applying a rule of evi-

sea, and otherwise, as far as *Laguira,* or *Porto Cabello,* no instructions appearing for the purpose, from the former owner, or consignor ; nor does his signature appear, but only that of another person, whom *Noah Pratt* asserts to be employed in the house of *De Wolf,* and to have signed, on account of his absence ; but it may be very well collected that this is a fiction of the clerk of *Hernandez and Chauviteau,* to give to the *Spanish* property the appearance of *American* property : *Wherefore,* this Court being persuaded, that as well for the reasons stated, as for having broken the law of blockade of introducing into the ports prohibited articles, the condemnation of the cargo will not be an infringement or violation of the rights of the *American* nation, respected by the chiefs of the Republic of *Venezuela :* the Court determine and declare as a good prize, the cargo of flour and meal which the *G. W.* was carrying to the enemy's ports ; liberates the vessel, &c. ; that on payment of corresponding duties, taxed costs, and the freight to the captured captain, the said cargo be delivered to the captor for his own use."

dence to interpret a contract, in order to render it void. Nay, he puts the doctrine on a more fanciful ground; that as the consignee has a right to receive the cargo, the captor, "having all the rights that belong to his enemy," has the right to take possession of it, and his possession is equivalent to a delivery to the consignee. If the captor, in succeeding to the *rights*, succeeded, also, to the *duties* of the consignee, this reasoning might be plausible; bnt when the payment by the consignee is to depend on the delivery of the goods to him, it is not easy to perceive how the possession by the captor, who *does not pay*, is equivalent to a delivery to the consignee. Indeed, the learned Judge is sensible of the fallacy of such reasoning, and is obliged to suppose that the consignor has, in his bargain with the consignee, guarded against the *loss by capture*; or, if he has not, that "he has acted improvidently, and without caution." Sir *William Scott* cites no authority whatever for this doctrine; and it is, manifestly, not supported by principle. In the first place, it infers the illegality of a contract, from the mere circumstance that it may be fraudulent. To consider a shipment, under such circumstances, as *prima facie* evidence of a fraud on belligerent rights, would be going far enough; but to pronounce a contract unlawful, because it may be abused for such a purpose, is unsound. A neutral may put his property, *bona fide*, on board of a belligerent vessel, or even an armed ship of the enemy, to be carried to the belligerent country; and it is not, therefore, to be treated as enemy's property; though this would be liable to great abuse and distrust. (*The Nereid*, 9 *Cranch*, 388. *The Atalanta*, 3 *Wheat. Rep.* 417.)

In the next place, this doctrine is inconsistent with the other and better reasoning of Sir *William Scott*, in the same case; where he says, "The goods are sent at the risk of the shipper. If they had been lost, on whom would the loss have fallen, but on him? What surer test of property can there be than this? It is the true criterion of property, that if you are the person on whom the loss will fall, you are to be considered as the proprietor." If this be so, where a contract is made in time of peace, there is no authority or principle which will support the position, that such a con-

tract is invalid in time of war. With the exception of
blockaded ports, and articles contraband of war, the right
of the neutral to make contracts with the belligerents, re-
mains the same as in a state of peace. If his contract to de-
liver goods to an enemy, is fraudulent, in fact, and not at
his own risk, but used as a mere cover to protect the pro-
perty of a belligerent, it ought to share the fate of bellige-
rent property. If, however, the contract is *bona fide*, it is
an unlawful restraint on the rights of a neutral to pronounce
it illegal.

Again : It is said, the property is good prize, because, on
delivery, it would belong to the belligerent, and the captor
succeeds to his rights ; that is, the right of receiving. But
from whom does the captor receive it ? From the neutral.
And whose property is it, until the capture ? The neutral's.
Its character can only be changed by a delivery to the ene-
my. It is, then, captured as neutral property.

In the case of the *Atlas*, (3 *Rob. Adm. Rep.* 299, 300.
*Sally-Griffiths*, in the note,) it is again laid down as the
doctrine of the Prize Court, that contracts of purchase ef-
fected by a belligerent, but the payment contingent, de-
pending on the delivery of the property, which remains at
the risk of the neutral, though lawful in peace, are unlawful
in war, and if taken *in transitu*, the property is to be con-
demned as enemy's property. Will this Court adopt such
a doctrine, and apply it to a contract between two of our
own citizens ?

In the case of *Ludlow* v. *Bowne and Eddy*, (1 *Johns.
Rep.* 1.) this Court reviewed the doctrine of the British Prize
Court, and refused to adopt it ; and the decision in that case
has been the law of this state since *February*, 1806. The
present Chancellor, though he differed from the other
Judges, did not rest his opinion on the doctrine of Sir *Wil-
liam Scott* ; but thought the agreement, in that case, fraudu-
lent in fact.

In the case of the *Venus*, (8 *Cranch*, 275.) Mr. Justice
*Washington* says, " To effect a change of property, as be-
tween seller and buyer, it is essential that there should be a
contract of sale agreed upon by both parties ; and if the
thing agreed to be sold, is to be sent by the vendor to the

vendee, it is necessary to the perfection of the contract, that it should be delivered to the purchaser or to his agent, which the master, to many purposes, is considered to be." In the case of the *Frances*, (8 *Cranch*, 418.) he says, "When goods are sent upon the account and risk of the shipper, the delivery to the master is a delivery to him as agent of the shipper, not of the consignee." In the case of the *Jose Indiano*, (1 *Wheat. Rep.* 208.) Mr. Justice *Story* says, " In general, the rules of the Prize Court, as to the vesting of property, are the same with those of the common law, by which the thing sold, *after the completion of the contract*, is properly *at the* risk of the purchaser." But, until the vendor "has done some notorious act to devest himself of his title, or has parted with the possession, by an actual and unconditional delivery, for the use of the vendee, no property in the goods vests in him."

2. Then, was the plaintiff bound to communicate to the defendants the contract under which the cargo was shipped ? It is not necessary to communicate or disclose any thing, for which the insured undertake by a warranty, express or implied. (*Marshall on Ins.* 475. *Shoolbred* v. *Nutt*, S. C. *Park*, 229.) The representation is merged in the warranty. If the defendants, not relying on their warranty, had asked for information, and the plaintiff had communicated what was not true, that might be a ground of defence. The case of *Haywood* v. *Rodgers*, (4 *East*, 590.) very strongly illustrates the rule on this subject.

*D. B. Ogden* and *S. Jones*, contra. 1. The cargo, upon its shipment in *New-York*, became the property of *Levy*, by delivery, and was not, therefore, *American* property. *L.* was the agent of the *Spanish* government, and made the purchase here. A delivery to him, was, in truth, a delivery to the *Spanish* government. He was to bear the costs and charges attending it, and to pay for the insurance ; the cargo was at his risk. The letter of instructions to the captain does not forbid the delivery of the cargo, without payment ; nor is he enjoined to demand payment of the purchase money. It is evident, that the contract of sale was consummated here, and that the payment for the cargo was not to

depend on its delivery at the ports mentioned. In the case of *Ludlow* v. *Bowne and Eddy*, the vendee was to give a bill of sale with a *guaranty*, and until that was done, the goods were not to be delivered. Here, if the goods had never been delivered at *Havanna*, or *Laguira*, or *Porto Cabello*, they must have been regarded as belonging to Mr. *Levy*.

Again : The vessel arrived at *Havanna*, and the agent of Mr. *Levy* altered the bill of lading, directing the delivery at *Havanna, or a market*, and ordering the master to proceed to *Laguira* or *Porto Cabello*; thus exercising complete ownership and control over the property. The master was instructed to deliver the property to the agent of Mr. *Levy*, not to the agent of the plaintiff. At and from *Havanna*, then, the property ceased to be *American*.

The counsel for the plaintiff has criticised the doctrine of the Prize Court, as laid down by Sir *William Scott*. But it is a doctrine which, on examination, will be found sound and well founded ; a doctrine, without which, no belligerent could maintain his rights, or repel the secret attacks of war in disguise. Nothing can be added to the learned, luminous, and cogent reasoning of Sir *William Scott* on this subject. And this country, whenever it becomes belligerent, will be compelled to adopt it, as indispensable to the maintenance of its rights. In *Ludlow* v. *Bowne and Eddy*, the cases cited from the admiralty, were not touched by the Court, but considered as inapplicable to the state of facts presented in that case.

2. Every fact which may vary or enhance the risk, ought to be disclosed to the insurer. It is enough, that a belligerent Prize Court would have considered this contract, no matter whether rightfully or wrongfully, as affecting the neutrality of the property. If so, it must enhance the risk. The insured is bound to communicate every species of intelligence which he possesses, which may influence the insurer in deciding whether he will insure at all, or what premium he will ask for making the insurance. (*Durell* v. *Bederley*, 1 *Holt's N. P. Rep.* 283—287. notes.)

Again : The facts in this case show, most clearly, that this was a cover for *Spanish* property, and that the plaintiff.

knew that he was covering belligerent property.    The let-
ter from the plaintiff to *Hernandez and Chauviteau,* was false
throughout, if Mr. *Levy* was to be the owner of the cargo
on its arrival at *Havanna.*    The fact is, that *Levy* was an
agent, sent out to purchase supplies for the *Spanish* govern-
ment, and the plaintiff must be presumed to have known the
fact.

3. The property was condemned by a competent Court
of Admiralty, for a breach of blockade; and, although the
sentences of foreign Courts of Admiralty are not held to be
conclusive in the Courts of this state, as to contracts be-
tween our own citizens, yet, [Here the counsel was stopped
by the *Chief Justice,* who said, that the doctrine on that sub-
ject had been so long and so definitively settled, that it was
not, now, to be questioned.]

*T. A. Emmet,* in reply, said, that the case of *Ludlow* v.
*Bowne* was quite decisive of the present case,. which is, in-
deed, stronger in favour of the plaintiff.    The delivery of
the goods was a condition precedent to the payment.    They
were put on board the plaintiff's own vessel, and under the
care of his own master; they were, therefore, in his own
possession, and under his own control.    The election to
deliver or not, was to be made at *Havanna, Laguira,* or
*Porto Cabello.*

Again : The treaty between *Spain* and the *United States,*
declares, that free ships make free goods; and it would na-
turally be supposed that the *Spanish* captors would adhere
to that article, until it had been otherwise declared.    Even
according to the reasoning of Sir *William Scott,* there can
be no fraud, unless the party knew that he was dealing with
an enemy, and intended to cover his property.    Now, the
case states that the plaintiff did not know of the contract
between *L.* and the *Spanish* government at *H.*    Suppose
the cargo had been lost by perils of the sea, who would
have borne the loss ?    Surely, it must have fallen on the
plaintiff, or his insurers.    The cause or mode of loss can make
no difference in the construction of the warranty.    If the pro-
perty had been warranted *neutral,* then the Court must have
looked to the law of nations, to ascertain what constituted its
neutral character.    But when the warranty is that it is *American*

property, they must look to the municipal law of our own country, to determine its *American* character. A warranty is to be construed according to the plain commercial import of the terms, among mercantile men. (*Marshall on Insurance*, 347 *a.*)

As to the alleged concealment, the answer is, that it is a matter covered by the warranty. A concealment, to vitiate the policy, must be fraudulent, and the fact of its being fraudulent must be found by a jury. (*Duguet* v. *Rhinelander*, 1 *Caines' Cases in Error*, 27. S. C. 2 *Johns. Cas.* 476. *Hallet* v. *Jenks*, 1 *Caines' Cases in Error*, 43—47.) The jury have not passed upon the fact, and the Court cannot draw the conclusion. But as *Levy* was a *Dane*, and his rights precisely the same, in regard to belligerents, as those of the plaintiff, it could not have varied the risk, or the premium, had it been stated that he was the owner. (*Le Roy* v. *The United Insurance Co*. 7 *Johns. Rep.* 343.)

SPENCER, Ch. J. delivered the opinion of the Court.

This case gives rise to three questions; 1st. Was the delivery of the cargo at one of the three ports, *Havanna*, *Laguira*, or *Porto Cabello*, at the election of *Levy*, a condition precedent to the plaintiff's right to demand payment of the stipulated price, according to the contract; or was the sale consummated here? 2d. Was the transaction a cover, and did the plaintiff know that the cargo was for the *Spanish* government? 3d. Was it necessary for the plaintiff to disclose to the defendants the circumstances under which the property was shipped, even if the risk was enhanced?

The contract on the part of the plaintiff is to deliver the cargo at one of the designated places; and it 'is perfectly clear that the election at which of the ports *Levy* would receive it, was in him. This right of election, to receive the cargo at *Laguira* or *Porto Cabello*, might be made and signified to the plaintiff at *Havanna*, and so it was understood by the parties to the contract. The policy speaks the same language. The cargo is insured from *New-York* to *Havanna*, and at and from thence to *Laguira* and *Porto Cabello*, or either of them, at a premium of seven per cent., to return five and a quarter per cent., if the risk ended at

ALBANY,
August, 1822.

DE WOLF
v.
NEW-YORK
FIRE. INS.CO.

*Havanna* without loss; thus making *Havanna* a port to which the vessel was to go, at all events, and leaving it optional with the assured to proceed to one or both of the other ports. The contract is to purchase and sell, *deliverable* in *Havanna, Laguira* or *Porto Cabello*. The risk of delivery rests on the vendor, and the purchase is incomplete, unless the cargo be delivered at one of the appointed places, to be elected by the vendee. As an indemnity for the risk to be incurred by the vendor, he was at liberty to procure insurance, which, in the event of the delivery, was to constitute part of the price of the cargo, and in the event of a loss, by the perils insured against, the vendor would find his indemnity in the insurance. Until, then, the plaintiff had performed his part of the contract, by delivering the cargo at one of the designated ports to be elected by *Levy*, the property never became vested in *Levy*, and the plaintiff never could recover the price, and consequently it remained the plaintiff's property. Such a contract, Sir *William Scott*, in the case of the *Packet de Bilboa*, (2 *Robinson*, 111.) considered lawful in time of peace, but as illegal in time of war, and as a fraud on the belligerent, because it went to protect property *in transitu* to the enemy, and as it deprived the belligerent of his right of capture.

It was urged, on the argument, that the cargo was received by the consignees at the *Havanna*, and that thenceforth the property ceased to be the plaintiff's. The vessel merely reported herself there to *Hernandez and Chauviteau*, to whom she was addressed; she remained there but two days, and never broke bulk; and then, by their directions, as agents to *Levy*, proceeded to *Laguira*. Nothing like an acceptance of the cargo at *Havanna* is perceived in these acts; but, on the contrary, an election not to receive the cargo there. It has also been insisted, that as the cargo was consigned to *Hernandez and Chauviteau*, and was not to be sold, what they did, and particularly the alteration in the bill of lading, was equivalent to an acceptance. It was shown, most satisfactorily, by the late Ch. J. *Thompson*, in the case of *Ludlow* v. *Bowne and Eddy*, (1 *Johns. Rep.* 1.) that the consignment was open to explanation, whether made to the consignees, on the account and risk of the consignor, or on

their account and risk. *Hernandez and Chauviteau* were also the agents of the plaintiff, in the event that they did not, as the agents of *Levy,* accept the cargo at *Havanna;* and, as such agents, they had a right, after electing not to accept the cargo there, with the assent of the captain, to alter the bill of lading in the manner they did, without compromitting the rights of either party. It was a necessary and an innocent act.

We come back to the question, whether the contract between the plaintiff, an *American* citizen, and *Levy,* a resident merchant at *St. Thomas,* was so far unlawful, as to subject the cargo to capture as *Spanish* property. The case of *Ludlow* v. *Bowne and Eddy* decides this case; and it is impossible to distinguish the two cases. In both, the property insured was warranted to be *American* property. There, the cargo was shipped by the plaintiffs under an agreement with merchants in *France,* whereby the plaintiffs were to deliver the goods at *St. Vallery,* for which they were to be allowed eight per cent. commissions, taking upon themselves all risk, expressly including a premium for sea risks as well as war risks; the consignees to pay freight on the delivery, and also for the amount of cargo, in bills on *London,* guarantied by a commercial house in *London.* The goods were captured *in transitu,* by the *British,* and condemned as *French* property. This Court decided, that the goods remained the property of the consignors, and that the warranty was complied with. A majority of the Court were of opinion, that the goods remained the property of the plaintiffs, until their delivery at *St. Vallery.* In that case, we held, that there was a right to withhold the delivery of the goods, until payment had been made according to the contract; and here, by the express stipulation of the parties, the plaintiff can have no right to demand payment, until he has performed the condition precedent; the delivery of the goods according to the contract; so that, in both cases, there was no change of property.

The decisions of Sir *William Scott,* in the Admiralty Court, were then pressed upon our attention; but we regarded them as the result of political expediency, and as evincing a determination in the *British* councils, to destroy

ALBANY,
August, 1822.

DE WOLF
v.
NEW-YORK
FIRE. INS. CO.

all commerce with their enemy, rather than as rules of international law. We adopted the broad and just principle, that a neutral had a right, and was justified by the law of nations, in supplying belligerents, with the sole exception of contraband goods, and going to a blockaded port. How can the existence of a state of war between *Spain* and her colonies, not then recognised by the rest of the world as independent states, or how can the existence of war between *Spain* and *Venezuela*, under any circumstances, affect such a contract, or render it unlawful? The warranty in the policy, that the property was *American*, means that it was so by the law of nations. If the contract would be a legal one in time of peace, which Sir *William Scott* expressly admits, and if the property would be deemed the plaintiff's, until actual delivery at one of the elected ports, what would vitiate this contract, or make the property the vendee's before the performance of the condition precedent, according to the law of nations? Certainly not because there was a war between *Spain* and *Venezuela*; for I trust that this country never will permit the great principle, that a neutral may carry on commerce with a belligerent during war, as well as in peace, with the exceptions already mentioned, to be infringed or abandoned. In the case referred to, we meant to dissent from the principles advanced by Sir *William Scott*, which go to consider all property bound to an enemy's country as belonging to the enemy, and as exposed rightfully to capture and condemnation. We meant to consider that rule as an arbitrary one, forming no part of the international code, and as entirely destructive of neutral rights. Subsequent reflection has served to strengthen the opinion I held in that case; and it has led to a conviction that the doctrines advanced by that eminent Judge, in the *British* Admiralty, were the result of power forgetting right, and the offspring of state policy, created for the occasion.

As to the alleged concealment, or non-disclosure by the plaintiff, that the cargo was intended by *Levy* for the *Spanish* government, the case definitively settles the point; for it is admitted by the defendants, that the plaintiff did not know that *Levy* had contracted with the Intendant at

ALBANY,
August, 1822.

*Havanna* to supply the *Spanish* government with flour and provisions ; and that he did not know that the cargo, on its arrival at its port of final destination, would have been applied by *Levy* to the performance of his contract.

But it is urged, that the facts and circumstances of the contract should have been disclosed, as the risk was materially enhanced. If it be conceded, that those circumstances did enhance the risk, the answer is decisive, that a party need not communicate any thing with respect to a fact, in regard to which there is an express or implied warranty. As to the conclusiveness of the sentence of condemnation, we are not at liberty to question the doctrine on that point, which has been definitively settled in the Court for the Correction of Errors, and has been so long acquiesced in. There must be judgment for the plaintiff, according to the stipulation in the case.

Judgment for the plaintiff.