Henry Schultz v. The Pacific Insurance Co.

HENRY SCHULTZ, RESPONDENT, vs. THE PACIFIC INSURANCE CO., APPELLANT.

| | |
|---|---|
| 14 | 73 |
| 29 | 246 |
| 29 | 256 |
| 14 | 73 |
| 30 | 207 |
| 14 | 73 |
| 39 | 517 |
| 14 | 73 |
| f41 | 272 |
| 14 | 73 |
| 50 | 418 |
| 14 | 73 |
| o52 | 163 |
| 52 | 164 |
| 14 | 73 |
| 54 | 422 |
| 14 | 73 |
| 55 | 78 |
| 55 | 542 |
| 57 | 284 |
| 14 | 73 |
| 60 | 264 |

1. Under Chapter 521 of the Laws of Florida, an appeal lies to the Supreme Court, from an order of the Circuit Court, refusing to set aside a verdict and grant a new trial. The provisions of the Code do not destroy the right of such an appeal.

2. It is the function of a jury to compare and weigh the character and credit of witnesses whose testimony is complicated and contradictory.

3. It is within the province and power of the court to set aside a verdict, which does not reach a substantially just conclusion, when there is just ground for the belief that the jury acted through prejudice, passion, mistake, or any other cause, which should not properly control them.

4. Where the Judge has declined to disturb the verdict of the jury, the presumption is that he exercised his discretion properly. It should be a very plain case to justify an appellate court in setting aside the concurrent conclusion of both court and jury, on the ground that their action was contrary to the evidence, or weight of evidence.

5. Where the court below gave credit to one witness, corroborated by another, rather than to two witnesses, who had sworn falsely to the incidents of the identical voyage, and to one, whose statements bore internal evidence of incorrectness, and refused to set aside the verdict of the jury, the case does not require this court to set aside the action of both court and jury.

6. Where the proximate cause of a leak, discovered shortly after sailing, which resulted in the loss of the ship, cannot be traced to a peril insured against, or to stress of weather, or to some accident upon the voyage, a presumption of unseaworthiness, when the vessel sailed, should be generated in the minds of the jury, and the insurer should be discharged, unless this presumption is overcome by the insured. In order to create this presumption the burden of proof of these facts lies upon the insured.

7. It is a compliance with the warranty of seaworthiness, if the ship is in a suitable condition to carry the cargo put on board, or intended to be put on board.

8. A necessary jettison, shortly after sailing with a proper load, without encountering a peril insured against, is a fact tending to generate a presumption of unseaworthiness. The burden is upon the defendant to prove that no peril was encountered, and the necessity of the jettison.

6

9. It is a general rule, where barratry is excepted from the risks, that if the immediate cause of the loss is a peril insured against, it is no defense that the loss was remotely caused by the gross negligence of the agent of the insured not amounting to barratry.

10. The underwriter is not liable to indemnify the insured for losses by the peril insured against, directly incurred through the frauds or gross misconduct of the insured.

11. The insurer can relieve himself by showing that the efficient and direct cause of encountering the peril was the failure on the part of the insured to act in good faith toward the insurer, or to exercise ordinary prudence in the management, navigation and care of the vessel.

12. The implied warranty of seaworthiness requires from the insured such a degree of care in the selection of his officers and crew as is necessary to obtain competent persons, and the principle extends to many other matters embraced in the contract. The burden of proof is here upon the underwriter. The presumption is with the insured after proof of loss.

13. The questions of seaworthiness and care in the navigation of the ship are questions of fact, dependent upon nautical testimony.

14. The owner has an insurable interest to the full amount of the freight, notwithstanding an advance to be charged against it.

15. The insured is not obliged to communicate any fact, as to which there is a warranty, express or implied, unless information upon the subject is particularly called for in the first instance.

16. In determining whether the master designedly cast away and destroyed his vessel, the jury must be satisfied beyond a reasonable doubt that he did so, before they can find against him. The rules of evidence are the same in civil and criminal cases. The character of the fact to be proved, and not the position of the party, determines the degree of proof to be required.

17. The verdict that "We the jury find for the plaintiff, and assess the damage at six thousand dollars, with interest from the commencement of this suit at legal rate," expresses the conclusion of the jury with sufficient certainty to justify a judgment thereon.

18. The only thing which gives verity to the correction and settlement of a case in this court, is the signature of the Judge. The want of this is a fatal defect.

Appeal from First Judicial Circuit—Escambia county.

The action was instituted by Schultz against the Pacific Insurance Company, to recover the sum of six thousand dollars with interest, being the amount of a valued policy

of insurance upon the freight of the North German barque "Mutter Schultz," on a voyage from Pensacola to England. The policy was issued to plaintiff, who was two-thirds owner of the vessel, and covers by express terms the interests of *all concerned* in the subject insured.

The declaration is in the usual form, and alleges the making of the policy, the sailing of the vessel on the voyage stated in it, and her subsequent loss by the perils of the sea.

The defendant appealed and plead to this action the following special defenses :

1. That the vessel, at the time she entered upon the voyage, was not seaworthy.

2. That the plaintiff, at the time the insurance was effected, concealed from the defendant certain material facts in relation to the condition of the vessel, which, had they been known to the defendant, would have prevented its agents from issuing the policy.

3. That the vessel was navigated upon the voyage stated in the policy with gross negligence, and her loss was occasioned by such negligence and want of skill on the part of the plaintiff, who was master of the vessel.

4. That the vessel was designedly cast away or run on shore by the master upon the voyage stated.

5. That the plaintiff is not entitled to recover in this action the sum stated in the policy, but only the difference between the estimated value of the freight contained in the policy and the amount advanced by the charterer to the master before the vessel sailed.

The case was submitted to the jury upon these issues under the charge of the court, which is part of the record here. The jury found for the plaintiff the amount stated in the policy, with interest from the commencement of this suit. After verdict the defendant moved the court to grant a new trial upon the following grounds :

1. That the verdict was contrary to law.

2. That it was contrary to the evidence.

3. That it was contrary to the charge of the court.

4. That it was contrary to the weight of evidence.

5. That the finding of the jury was so uncertain that no judgment could be founded upon it.

The motion for a new trial was overruled by the court, and from the judgment upon this motion the present appeal was taken.

At previous terms of the court. there had been a trial of the issues of fact by the court, resulting in a jugment for the defendant, and a mistrial by a jury. This is the third trial.

*Mallory & Maxwell* for Appellant.

1. The bark was not seaworthy when she entered upon the voyage, and, therefore, the policy never took effect, and from whatever cause the loss occurred, the insurers are not bound to pay. Marshall on Ins., 363, 369, 373, 368-9-7 ; Mumford vs. Mumford, 1 Caines' R., 520, 522 ; Abbott on Ship'ng, 446 ; 3 Kent, 205 and note *a* ; 1 Arnauld on Ins., 653-4. And it is unnecessary to inquire whether fraud was intended or not, or whether the owners had knowledge of it. 1 Arnauld on Ins., 654-5.

Freight, ship and cargo, governed by same rule of seaworthiness. 1 Arnauld, 654, note, 667-8, 670, 691, 689, 690 ; 2 Arnauld, 1367.

2. Whether the bark was unseaworthy when she sailed is a question of fact, and the highest and most convincing proof is found in her having 8 feet water in her hold, twenty-four hours out of port, without any adequate cause for it.

The language of all writers on insurance, and of all courts adjudicating insurance, may be summed up in the following :

"If a defect appear soon after sailing, without any visible cause, the inference is that she was not seaworthy when she sailed." Marshall on Ins., 373, 369 ; 1 Phillips on Ins., 725 ; 2 John. Rep., 124 ; 1 Arnauld on Insurance, 689, 690 ; 2 Arnauld, 1367.

"The warranty of seaworthiness, whether expressed or implied, is, that the vessel shall be able to perform her voyage with the cargo with which she is then loaded." Abbott vs. Braine, 1 Caines' Rep., 292, 520, 522.

"When she vessel leaks the day after leaving port, without bad weather, the presumption is against her seaworthiness when she sailed." 2 Bay's Rep., (Sup. C'rt, S. C.,) 503 ; 2 Parson's Mar. Law, 139 ; 2 McCord, 336 ; 2 Wash. C. C. Reports, 376 ; 1 Phillips on Ins., 725 ; 2 Phillips on Insurance, 2079.

"Where the vessel becomes leaky soon after sailing and this cannot be ascribed to any violent storm, the presumption is she was unseaworthy when she sailed." 1 Brevard, 252 ; Myers vs. Girard Ins. Co., 26 Penn. R., (2 cases) 192 ; and see Lords Ellenboro and Mansfield in 1 Arnauld on Ins., 678–9, 689–90–91, text and note.

In the case of the brig Gen. Armstrong, 2 McCord, (S. C. Rep's,) the digest evidently gives a wrong report, for the facts as described show that the insurers were not liable, and the court applies the correct principle of law.

In the case at bar the three seamen declared that the weather was mild and fine, but the master and mate say that they had a fresh wind and were "hove-to" for 10 or 15 hours. But they say nothing of any extraordinary sea peril to cause the vessel to leak, nor do they show that she lost a rope-yarn, a spar or a sail, or encountered risk or inconvenience.

3. To render the insurers liable for the loss, the bark must not only have been seaworthy when she sailed, but the owners were bound to keep her so, subject alone to the perils insured against. And hence it was their duty to have gone into an intermediate port, Key West or Havana, and repaired her. 1 Arnauld on Ins., 667–8 ; Abbott on Shipping, 446, and see this doctrine ably discussed and enforced in 3 Kent, 3d ed., 203, part 5, Sec. XLVII, and 205, text and note. And see Arnauld also, where the decision of the Sup.

Court of Mass. declares this to be the American law of Insurance. All the French and German writers, including Emerigon and Volin, to the same effect. 2 Parsons on Maratime Law, 139, 140 and note ; 12 Cush., 517 ; 10 Pick., 237 ; 2 Phil. on Ins., 2079, and see 2 U. S. Dig. 565, Sec. 109.

" It is the duty of the assured to keep the vessel seaworthy while the risk attaches, if he can do so, and it seems the insurer will not be liable for loss occasioned by unreasonable neglect to keep her seaworthy."

4. " If the vessel was lost by the fault, neglect, negligence, or misconduct of the master, (part owner,) the insurers are not liable." Gwin vs. the Phœnix Ins. Co., 13 John. 450.

" If the negligence is so gross as to authorize the presumption of fraud which would constitute barratry, the underwriters are not responsible, unless the policy expressly insures against barratry. 1 McClean's Rep., 375, (the Merchants & Louisville Ins. Co. vs. Walters.)

" It is an implied exception to the risks insured against, that the assured is not entitled to indemnity for loss incurred by his own fraud, or gross fault, or his violation of law." 1 Phil. on Insurance, p. 31, Section 41 ; 2 Arnauld on Insurance, 775-6-7.

5. *Concealment.*—The proof is, that the vessel lay at the head of the wharf in a southeast gale, and pounded the wharf down, breaking nineteen piles, and nearly demolishing it ; and that she thus received injury to her side, which caused the master to take out and renew planks on her bends. This fact was not made known to underwriters.

It may be said that the warrantee of seaworthiness absolved the master from giving this information, but such is not in harmony with the current decisions of the country, which now hold the assured to perfect good faith. Burritt vs. Saratoga Ins. Co., 5 Hill, 188 ; Curry vs. Commonwealth Ins. Co., 10 Pick., 535 ; Sawyer vs. Coasters' Mu. Ins. Co., 6 Gray, 221 ; Dixon on Insurance, 68, 7 ; 2 Caines' R., 69 ; 1 Story C. C. R., 57 ; 1 Arnauld on Ins., 492-1, 540-1 ; 1

Story's Eq. Jur., 166, 216; 3 Kent, 282; 2 Duer on Ins., 379; 1 Wash. C. C. R., 385; 2 U. S. Dig., 177, § 326; 3 Dall., 491; 1 Peters C. C. R., 185. The law of the United States, irrespective of the warrantee of seaworthiness, demands all information, &c.

6. The master took up in advance, for and on account of his freight to be earned, £763,13, equal to $4,727.73, and this left the freight at risk only $4,272.27, and upon this amount at risk only can a recovery be had under any circumstances. Dix on Ins. and Average, 42 and note on pp. 43-4; 1 Arnauld on Ins., 241-2, 244, 266-7, 250, 207. In this case the master had no further interest in the sum of £763.13, because he had the money in his pocket. Suppose he had received all his freight in advance, could he have recovered on this policy? Certainly not; for the "insurable interest" would have passed from him and gone to the party advancing the freight. Note to 2 Arnauld 1,349-50, 1,347; 2 Arnauld, 1,282; 1 Sumner, 451; 1 Arnauld on Ins., § 303, 300; 1 Arnauld, 297-8-9, 266.

"Advances by the charterer (as in the case at bar) on freight cannot be recovered from the owner as advances on freight. He is at no risk to pay it back." 1 Arnauld, 266. (See late case of the Anastoria, quoted by the adjusters, and found in 1 Benedict's Dist. C. R., 188, where it was held that the freight was, so far as the ship-owner was concerned, paid to the extent of the advance, and was not at risk.)

7. *Master's right to sue for other owners.*—He has no such right, either to insure or to collect insurance, without express authority. Charleston Ins. and Trust Co. vs. Conner, 2 Gill, 410 (reported in 7 U. S. Dig., 313, § 16,); Griswold vs. N. Y. Ins. Co., 3 John., 321; 1 John., 205.

"*For whom it may concern.*"—1 Arnauld, 146-7-8, text and note; 1 Phil. on Ins., 383, 387, 966, 379, 380; 2 Duer on Ins., 99, § 6, 100, § 7; Abbott on Ship., 9, Ogle vs. Manyham, 77, note.

In the case at bar the master brought suit in his own

Henry Schultz v. The Pacific Insurance Co.

name, and for his own account, for whole amount of insurance, while he declares himself but two-thirds owner, and shows no authority from the other owners.

Submitted with brief—First, Charter party; Second, Bill of lading and receipt for advances; Third, Coast survey chart of Florida reef; Fourth, American coast pilot, Blunt's.

8. *Testimony of voyage and its incidents.*—The plaintiff, Schultz, with his mate, are the only witnesses for his cause, and the rule of evidence as to credibility must be applied to both, as both are interested—the master in $6,000 and his reputation, and the mate in $300 and his reputation.

Testimony of voyage and its incidents, for defendant, is of three of the crew, unimpeached, and who are in perfect accord as to all material points of their evidence.

*What they prove.*—First. That after leaving Pensacola bar the weather was mild and pleasant; that in such weather the bark began to leak, and had generally from five to eight feet water, and they never ceased pumping until she was lost.

Second. That master told them the names of the lights of Sand Key and Key West, when they saw them and passed them.

Third. That he said he would sail near the land and would not cross the Atlantic.

Fourth. That after getting ashore he instructed them to say that they saw but one light, and this a fixed light.

Fifth. That he pointed out to the mate how she would be made to " fetch up on the reef."

Sixth. That all the crew complained to master of the un-seaworthy condition of the ship.

9. The master and mate swear as follows: First saw the Sombrero light-house at 4 P. M. of the day we got ashore, and it then bore north 14 miles off. The mate says, "I last saw Sombrero light at 10 o'clock P. M. of the night we got ashore, and it then bore west by south, distant 13 miles. The bark was then heading east northeast, going from four to five miles an hour, with a steady breeze."

This fixes the position of the bark exactly. At 10 P. M. she was just 37 miles northeast of the American shoal; and yet, in 105 minutes or 1¾ hours after, she ran ashore in it—to do which she must have gone 20 miles an hour stern first. See the chart of the reef, and measure with the scale. Nothing—no part of the evidence—can be so conclusive as this; and it is to be kept in view that no explanation of this extraordinary statement is offered.

It must also be borne in mind that if we take the winds, courses and distances given by the mate, and substitute for Sombrero the Key West light, her going in the American shoal is explained. The master and mate spoke with their log-book in hand, and this extraordinary statement must invalidate all they say.

10. Mr. Anderson and Mr. Willis both swear that the master told them his bark was insured at home, and Mr. Anderson says, "I think he said well insured." Eche, whose statement is unexplained and uncontradicted, says that the master's assertion to Williams was, "Unless she is teetotally lost, I will not get my insurance."

*Conclusion.*—1. The bark was unseaworthy at the inception of the risk, and consequently the policy never attached, and no question of owner's good faith is involved or need be raised.

2. The bark should have been taken to Havana, or Key West and repaired; and the neglect to do so releases the insurers from liability for her loss, and in such case no question of the owner's good faith is involved or need be raised.

3. The bark, in seeking the Florida reef instead of pursuing her course in the middle of the Gulf, her owner committed gross negligence and carelessness and fault, which releases insurers for her loss, and this without raising a question of the owner's turpitude.

4. The master wilfully stranded her, which releases underwriters.

*C. W. Jones* for Respondent.

This appeal was taken from an order denying a motion for a new trial, and from the judgment rendered on the verdict found by the jury.

1. It is contended in behalf of the respondent that no appeal lies in this State from an order denying a motion for a new trial, except in actions other than for the recovery of money only.

This is an action for the recovery of money only, and therefore the order denying the motion cannot be reviewed.

2. That if the order denying the motion for a new trial cannot be appealed from directly in this kind of action, then the order cannot be considered upon an appeal from the judgment on the ground that it is an intermediate order necessarily affecting the merits. An order denying a motion for a new trial is not, under the Code of Practice, an intermediate order. It is very questionable whether it could have been so regarded under the former practice. At common law, judgment was never entered until the motion for a new trial was disposed of. Under our present Code of Practice, the judgment, unless specially ordered to be stayed, must be entered upon the return of the verdict. It often happens in practice under the Code that an order denying a new trial is subsequent to the judgment, and is the last order in the cause.

In this case the motion for a new trial was made on the same day that the judgment was entered, and the order denying the motion was made subsequent in date to the judgment. Is the order denying the motion for a new trial, therefore, an intermediate order ? The word "intermediate," as used in the Code, was intended as a substitute for the technical term "interlocutory," for the framers of this new system of practice have deemed it important to change the names of things without changing their character or nature. A declaration is called a complaint, a plea an answer, &c.

Henry Schultz v. The Pacific Insurance Co.

But it would be strange if the Legislature, while they prohibited an appeal from an order denying a new trial in actions for the recovery of money only, should allow the same end to be reached by a simple appeal from the judgment. The object of the law in permitting an intermediate order affecting the merits to be considered on an appeal from the judgment, was to prevent delay and a cause coming up before this court in fragments.

Had the Legislature given an appeal directly from each order in the course of an action, a cause might, be brought here a half dozen of times before final judgment. To avoid this it required the case to go on, and in the event it goes against the party whom the intermediate order injuriously affects, then he may have such intermediate order considered upon appeal. But an order denying a motion for a new trial does not fall within the mischief contemplated by this provision. The order denying the new trial in nearly every case must occur after the final judgment, and therefore if the Legislature intended that such order should be reviewed here, there is no reason for denying the right of a direct appeal from it.

In the case of an intermediate order, a direct appeal is denied, because the party affected by it may finally succeed in the action, and therefore have no need to complain of it.

In the case of an order denying a motion for a new trial, the judgment is ascertained, the unsuccessful suitor is known, and if the court below erred in overruling the motion, the remedy should be by a direct appeal from the order.

But again, a motion for a new trial is collateral to and not directly connected with the suit.

It cannot be said that such motion necessarily affects the merits, when it had no agency in producing the final result—the verdict. The provision in question was intended to give a party an opportunity to have an order or decision reversed which tended in some measure to produce the unfavorable result.

Henry Schultz v. The Pacific Insurance Co.

Do not the words "necessarily affecting the merits," clearly indicate that the Legislature meant some order or decision by the court in the progress of the cause, which affected the rights of the suitor in connection with the facts proven? What has the making or denial of a motion for a new trial to do with the merits of a case which is ripened into judgment? The court simply says it will not disturb the finding of the jury upon the facts and law. Orders of this kind were always regarded as discretionary with the court, and what is discretionary can never be said to confer any right upon anybody.

The next objection which we make is, that there is nothing in the record before the court which will justify a reversal of the judgment.

An appeal from a judgment only opens for this court purely legal objections which were properly taken and excepted to in the court below.

It will be seen from the case as settled, that there is not one exception stated in it. The case comprises the evidence on both sides, the charge of the court to the jury, the motion for a new trial, &c.

This case was prepared for the purpose of having the order denying a new trial reviewed.

In order to question the judgment, some matters of law should be presented by exception. One of the grounds taken for a new trial is the misdirection of the Judge. To make the errors of the court a ground for reversing the judgment, it must appear that the ruling was excepted to and the exceptions afterwards settled according to the Code and rules of this court. No exception to the ruling of the court on the trial appears in this case. A brief statement of the grounds of the motion for a new trial is part of the case, and the ruling of the court denying the motion is stated to have been excepted to. But of what avail is this if the appellants cannot review the order denying the motion?

Henry Schultz v. The Pacific Insurance Co.

All the various grounds set forth in the motion were offered as reasons to the court below for a new trial; they do not and cannot affect the judgment outside of the motion. If the court misdirected the jury, if the verdict was against law or against the evidence, then were all the matters to be considered by the court upon an application for a new trial; but I insist they are not matters to be regarded upon an appeal direct from the judgment. If the court during the progress of the trial made any erroneous ruling upon the evidence, or in giving or refusing instructions to the jury, and the action of the court was excepted to at the time, and afterwards settled in a case and exceptions, these matters might all be considered upon an appeal from the judgment.

If, as I insist, the granting or refusal of a new trial is discretionary with the court and not reviewable upon appeal, then the grounds of the motion, as well as the order denying it, must be left out of consideration in this appeal.

It is well settled that upon an appeal from a judgment, the court cannot look into the evidence with the view of determining whether or not it supports the verdict. Neither can it, under the general objection that the verdict is contrary to law, set aside the judgment; and if the misdirection of the court is the ground of objection, it must appear that the charge was excepted to, for certainly an objection or exception to an order denying a new trial in a case when such order cannot be reviewed, will not dispense with the necessity of an exception to the charge of the court when such charge is made the basis, if the same have been settled.

2. If the court should, in the present condition of the case, look into the evidence and the rulings of the court below on the trial, with the view of determining whether a new trial ought or ought not to be granted, then we say there is nothing in this record which will justify the court in setting aside the judgment.

The verdict of the jury is not contrary to law. The Judge below left the question of seaworthiness to the decision of

the jury, as matter of fact. As to the legal presumption of unseaworthiness which arises when a vessel becomes unable to prosecute her voyage a short time after sailing, without adequate cause to produce it, the Judge stated the law very favorably for the appellants, but the jury found the facts against them.

. The law is, that when a vessel, shortly after sailing, becomes unable to proceed on her voyage in consequence of a leak or other defect, without any adequate cause to produce such inability, the presumption then is that she was unseaworthy when she sailed, and it then becomes the duty of the assured to show the condition the vessel was in when she sailed, or in other words to rebut the presumption, and it is for the jury to say whether the presumption is rebutted or not

In this case the respondent proved by a great number of witnesses that the vessel was seaworthy when she sailed, in the evidence of Mr. Kaskill, Mr. Fingil, Robert Smith, Mr. Thomas, the mate, Mr. Hughn and others.

If the testimony of these witnesses satisfied the jury that the vessel was seaworthy before and at the time she sailed, then they had a right to refer the leak refered to, not to the unseaworthiness of the ship, but to a peril of the sea. Miller vs. South Carolina Ins. Co., 28 ; 2 McCord Rep., 346 ; Patrick vs. Hallet, 1 John., 245.

Again. The appellants at the time the policy was effected agreed that the vessel was seaworthy by incorporating a statement to that effect into the policy. 13 Mason & Welsby.

: As to the defence of negligence and unskillfulness set up in the answer, there is no evidence before the court to show that such existed or that the vessel was lost thereby. When this defence is plead, it must be shown that the negligence was the direct and not the remote cause of the loss. 3 Sumner, 270 ; 13 Peters, 415 ; 3 Kent's Com. 395.

All the issues presented by the pleadings in this case were

decided by the jury on conflicting evidence, and the credibility and character of many of the witnesses was assailed.

The principal witnesses for the appellants were impeached by their own sworn statements, made but a few months before, in which they gave a contradictory account of the circumstances attending the loss of the ship from what is found in their subsequent evidence. Under such circumstances, the court cannot set aside the verdict without passing upon the credibility of the witnesses. The following authorities are submitted on this part of the case :

A verdict should not be set aside because the court would have come to a different conclusion from that of the jury as to the force of the testimony. Fleming vs. Smith, 44 Barbour, 554 ; 29 California, 18.

A new trial will not be granted when the burden of proof is upon the appellant, and there is a conflict of evidence. Crook vs. Forsyth, 30 California, 662.

When the evidence is conflicting it is a question for the jury to determine under all circumstances to whom they will give credit. 36 Ill., 60 ; 45 Ill., 311.

In a civil cause, when the court trying it approves the verdict by refusing to set it aside and there is not an entire want of evidence, the Supreme Court will not interfere and reverse, although the verdict may seem to be greatly against the weight of evidence. 43 Mo., 359 ; 26 Iowa, 559.

What then is there before this court which can be looked to for the purpose of impeaching the judgment ? Absolutely nothing.

When an appeal is taken from the judgment of the court or the Judge sitting as a jury, the law requires exceptions to be filed to the ruling of the court within ten days from the time such judgment is entered, and afterwards these exceptions must be settled with a case for the purpose of an appeal.

The law further requires that the legal question in such cases shall be from the question of fact. It would be strange

that the law should require exceptions to be made to the law, as stated by the court when a jury is waived, and not require any when the case is tried by a jury.

There is no exception in the record before the court except the one which relates to the order denying the motion for a new trial.

But, if the question shall be considered open here, that the order may be reviewed, then the simple duty of this court is to consider whether the court committed an error in denying the motion below.

It is not the question whether a new trial should be granted by this court upon a review of the evidence adduced on the trial or the charge of the Judge, but whether under all the circumstances the Judge so far abused the discretion vested in him in denying a new trial, that this court will reverse the order and let the motion stand as allowed.

Upon these points I refer the court to the following authorities :

No appeal lies from an order denying a new trial on the grounds that the verdict is against the evidence or the weight of evidence. Young vs. Davis, 30 N. Y. Rep., 134.

An appeal from an order granting a new trial does not bring up any questions of fact, but only questions of law. Hoyt vs. Thompson's Ex'trs, 19 N. Y., 207.

An appeal from an order denying a new trial does not affect or prevent the entry of judgment. 19 Howard, 515 ; 22 Howard, N. Y.

On an appeal from a judgment in an action tried by a jury, the court will not review the case upon the evidence with a view to determine whether the verdict is against evidence. Such an appeal presents only questions of law. Bedell vs. Com. Ins. Co., 3 Bosworth, 148.

The decision of a motion for a new trial can only be considered on an appeal from the order denying the new trial. 12 Abbott, 164 ; 22 Barbour, 650 ; ib., 568.

Henry Schultz v. The Pacific Insurance Co.

The motion for a new trial must be made before the entry of judgment. 33 Barbour, 645; 12 Abbott, 281.

Orders denying motions for new trials are not intermediate orders, necessarily affecting the merits within sub-division 2, Sec. 11, Code of Procedure. Selden vs. Canal Co., 29 N. Y.; 2 Tiffany, 634.

When there are no exceptions contained in the case as settled, nor any allusion to any, there is nothing for the Court of Appeals to review. Ward vs. N. Y. R. R., 29 N. Y.; 2 Tiffany, 616.

Objections to the ruling of the court below must be made at the trial, else they cannot be considered on appeal. Stewart vs. Harper, 4 Greene, (Iowa) 452; 16 La. Annual Rep'ts, 181; 15 Iowa, 476; 33 Missouri, 149, 577.

The Supreme Court will only consider questions of law presented by exceptions and taken in the cause. If the case contains no exceptions, there is nothing for the court to review. Wilcox vs. Hawley, 31 N. Y., 648.

On appeal from a judgment in an action tried by a jury, the appellant cannot be heard upon the question whether the verdict is contrary to evidence. Anthen vs. Smith, 4 Bosworth, 503.

On appeal from a judgment, he can only be heard on exceptions taken at trial. A new trial will not be granted when the case has been fairly submitted on its merits, though there may appear to have been a preponderance of evidence against the verdict, especially if the testimony is conflicting, or if the Judge who tried the cause is satisfied with the finding. 48 Barbour, 302; 32 Ga., 472; 36 Ga., 246, 332; 30 Ill., 178; 32 Calf., 166; 23 Iowa, 308; 12 Minn., 130.

In the case of the Pensacola & Georgia Railroad Company vs. Nash, 12 Fla., 513, this court says: "When the evidence is conflicting, making it the duty of a jury to decide upon the credibility of the witnesses, the court will not set aside a verdict against evidence."

. No exception whatever was taken to the charge of the court, and as to the objections made now to the ruling below, they are too late and not well founded.

The court instructed the jury, in accordance with very high authority, that in order to find for the defendant upon the fourth defence or issue, that the respondent designedly and intentionally cast the ship away, they should be satisfied of the truth of this allegation beyond a reasonable doubt. This defence involved a high criminal charge, a capital felony under the laws of the United States, which, if true, would destroy the character of the plaintiff forever.  Bradish vs. Bliss, 35 Vt.; 6 Shaw, 326; Thurtell vs. Beamont, 1 Bingham, (Common Law R.;) 339. .

The next objection is, that the respondent was not entitled to recover the sum of six thousand dollars, the amount stated in the policy, because, before the policy was effected, he received some advances upon account of his freight.

This is a valued policy of insurance, and it is not competent for an underwriter, after a loss has occurred under such a policy, to dispute or question the value of the subject at risk.   The sum stated in the policy is conclusive on the insurer, and he is estopped from denying it.   1 Sumner, 451; 6 Cranch, 206; 3 Peters, 222; 2 Washing. C. C. R., 468; 3 Kent's Com., 361; 2 vol. Amer. Leading Cases, 587–8. In this case, the respondent only insured the amount of freight which he expected to earn, after deducting the advances.   The advances were received before the policy was issued, and the sum stated in it is the amount agreed upon between the underwriter and the assured, which the assured would have probably earned had the voyage been performed.

The object of their policy is to dispense with all proof of loss, and if the underwriter agrees to a sum which in case of loss will more than indemnify the assured, and receives a premium on that sum, there cannot be found a decision in this country or Europe which will support his claim to exonerate from the payment of the full sum stated in the policy.

But the appellants were not entitled to the benefit of such a defence as this while they denied the right of the respondent to recover anything whatever. If they relied upon the question as to the amount of the recovery, they should have paid the sum which they considered due into the court, or made a tender of it, and then contested the right of respondent to the balance.

They did not ask the court at the time to charge the jury "that the sum stated in the policy was not the true measure of damages," but they accepted the charge as correct, took their chances of success under it, and after an unfavorable review to them, they then objected to the charge. To have made the rulings of the court below reviewable here, they ought to have been excepted to at the trial, and the exceptions afterwards duly settled, in accordance with the rules of the court.

WESTCOTT, J., delivered the opinion of the court.

The case presented by this record, with the exception of some objections to the law, as given to the jury by the court, and another to a matter arising upon the record, is a motion for a new trial based upon a consideration of the entire evidence in the case.

The position is taken that an appeal does not lie from an order of the Circuit Court, refusing to set aside a verdict and grant a new trial, and that the exercise of such discretion cannot be here reviewed. It is insisted that granting a new trial is a matter within the discretion of the Circuit Court, not of right in the party; and for that reason is not an intermediate order involving the merits and necessarily affecting the right of the party within the meaning of subdivision one of section ten of the Code.

In disposing of this question, we deem it unnecessary to determine whether such an order is of the character mentioned in subdivision one, in view of our conclusion that

even if it is not such an order, yet the right of the party to have such an order reviewed is given by the first section of chapter 521 of the laws, and the effect of the provisions of the Code is not to destroy that right but simply to regulate the practice in its exercise. We reach this conclusion by a consideration of all of the statutes having reference to the subject matter. We give them a consistent construction, and one which we conceive carries out the intention of the Legislature in enacting the Code.

Upon an appeal from a final judgment, the act of 1853, chapter 521, gives the party the right to have such exercise of discretion by the Circuit Court reviewed by this court. The last clause of section 210 of the Code prescribes the method by which the decision of the court upon a motion for a new trial is to be brought to this court upon an appeal. The Code therefore in its letter recognizes the existence of such right. The repealing clause of the Code repeals only such statutory provisions as are inconsistent with it, and secures all rights of action given or secured by existing laws. The intention of the Legislature in the enactment of the Code was to abolish the distinction between legal and equitable remedies, and to have uniform proceedings in all cases. It was to regulate the practice but not to destroy the right. It was the right of the party anterior to the Code to have such an order reviewed, and the effect of that section of the Code authorizing appeals in certain cases is not to destroy a right to appeal in other cases, or to limit the operation of an appeal to the cases enumerated in that section. A statute regulating the practice and to some extent the appellate jurisdiction of the court, which itself prescribes the practice in the matter of appeals authorized by antecedent laws, should not be held to repeal those laws, where the general purpose of the statute is not to destroy the right, but simply to regulate the practice in such cases.

In this case there has been one trial by the court, which resulted favorably to the defendant; one mistrial by a jury,

and this the third trial by a jury, resulting favorably to the plaintiff.

The mistrial should not benefit either party, and the finding of the court for the defendant upon the facts, followed by a finding for the plaintiff by the jury upon the facts, enables us to consider the case as if it was the first trial; neither party we think can claim any advantage by these proceedings.

The verdict of the jury here is founded on the evidence of facts, complicated and contradictory, which required an investigation into the character and credit of the witnesses, whose testimony it was necessary to compare and weigh. To do this is the proper function of a jury. 1 Brevard, 150; 2 Stranges, 1,142; 2 Burr, 665; 1 Wils., 22; 1 Burr, 396, 609; Cowp., 37; 2 Wils., 249; 3 Wils., 47.

While it is true that this is the proper function and province of the jury, it is at the same time true that in cases where there is conflict in the testimony, it is within the province and power of the court to set aside a verdict which does not reach a substantially just conclusion in cases where the conflicts are of such character and the circumstances of such nature as to give just ground for the belief that the jury acted through prejudice, passion, mistake or any other cause which should not properly control them. This power exists in the court. In exercising it the court does not encroach upon the province of the jury, for the reason that it does not conclusively settle facts in the form of a verdict, but only gives another jury the opportunity of so doing, and of correcting what appears to be a mistake. If this is not properly within the power of the court, then the result is that the first twelve men that happen to constitute a jury in a given case are by law the final arbiters of the facts in that case. There is no such principle of law.

This is a conservative and justly prized power of the court; like all powers it may be abused. It is much better, however, that exceptional cases of its improper exercise

should be endured than that the security which it affords should be withdrawn. The rule which should govern a court in the exercise of this power should be a fair view of the justice of the particular case, the character of the conflicting testimony, and the surrounding circumstances, rather than an extraordinary degree of respect for the maxim *ad questionem facti non respondent judices ad questionem legis non respondent juratores*—and wherever it appears to the court that there is difficulty in reconciling the verdict with the justice of the case, and the manifest weight of evidence, there the court should not, from a too great respect for this wise and venerable maxim, withhold its power. This is the rule which should govern the judge of the court presiding at the trial, who has the same opportunity as the jury to observe what occurs in the trial. In all cases of appeal the presumption is that he exercised this discretion properly, and the case is not presented to this court as it was to him, because this additional presumption is added to the verdict. Where he has declined to disturb the verdict of the jury, a very clear and strong case must be made out before this court would feel justified in reversing his action. It should be a very plain case to justify an appellate court in setting aside this concurrent conclusion of both court and jury, upon the ground that their action was contrary to the evidence or weight of evidence.

With this statement of the rule which should govern us in the consideration of cases involving conflicts in testimony where a new trial has been refused, we proceed to apply it to such portions of this testimony as are contradictory, and to determine what is the condition of this case in that respect. There are manifest conflicts in the testimony of the mate, and that of Grant the cook, and the two seamen, Brown and Hitchings. The mate testifies that there were ten or fifteen hours of dark and cloudy weather on the 20th, during which the wind was blowing fresh, and there was a heavy sea, the ship laboring very heavy; that during like-

weather on the 21st the ship was found to be leaking, and that there was about six feet of water in the hold; that sixteen pieces of heavy timber were thrown overboard, and that the men were kept at the pumps at one time three hours, or during their watch, half the crew; that the bark became free of water on the morning of the 23d, after which, and up to the time of her loss, she made about eight or ten inches of water in twenty-four hours.

Grant, the cook, testifies that the depth of water in the bark was seven feet on the morning of the 21st. In one place he says that after the pumps were first tried, the men were kept constantly at the pumps night and day. In another place he says that after throwing over a portion of the deck load the pumps sucked; that there was an intermission of twelve hours, when the water had gained five or six inches. He says, also, that the water got to be eight feet, and that the weather was fine and the wind fair up to four o'clock on the 26th. Brown, one of the seamen, testifies that upon trying the pumps first there was two feet water in the pump-well; that on the second day out, the 21st, there was three feet of water in the pump-well. In one place he says that this was preceded by a squall and rain, and in another that from the time he left Pensacola to the afternoon of the 25th, the weather "was variable and light, with rain;" that the bark required to be pumped every fifteen minutes; that it took three-fourths of an hour spells to free her after standing fifteen minutes; that the bark was at times during the voyage free from water, when all the ship's company was employed and the weather was light; that after sucking the pumps, in about ten minutes there would be sixteen inches of water in the pump-well, and it would take four men three-fourths of an hour to suck the pumps after standing ten minutes; that the bark had to be pumped about every hour in the twenty-four, and that when the crew kept steady at the pumps, and the wind was light

and the sea smooth, they would suck about two or three times in twenty-four hours, and that she was not seaworthy. Hitchings, one of the seamen, testifies that when twenty-four hours out the bark sprung a leak. In one place he states five feet of water was found in the pump-well at this time, in another that six feet was found; that after this, and up to the time she got ashore, the pump-well averaged eight feet; that on the third day out the master called the crew, himself among the number, aft, and asked what was best to do, when he replied that they ought to return for repairs; that the captain said, we will throw the deck load overboard, and the crew must not be alarmed, as he was going to hug the land, and that on Friday, the sixth day out, half of the deck load was thrown overboard. This witness makes six feet water in the pump-well on Monday at eight or ten o'clock. This is inconsistent with the testimony of every other witness. He also has the jettison of the timber to occur when six days out, when it happened on the third day out. He makes an average of eight feet water in the hold, when the testimony of Grant and Brown is that the men were constantly at the pumps. If what they say is true, there could be no such average. In this conflict the jury believed the mate and disbelieved the seamen, and we think the reason for their so doing is found in the record.

The witnesses, Grant and Brown, on the 30th December, 1869, when all of the facts connected with this matter must have been fresh in their minds, joined in the protest of the captain and then swore " that on the 21st day of December, the bark suddenly made more water than usual, and at one time during that day had five feet of water in her; that the leak was supposed to be somewhere in her topsides, and therefore sixteen pieces of heavy timber were thrown over from deck, after which the bark was freed from water, the leaked ceased, and the ship was dry; that when they left Pensacola the bark was tight, staunch and strong;" that the loss was owing immediately to adverse winds, heavy,

Henry Schultz v. The Pacific Insurance Co.

squally and foggy weather, and a strong, adverse current, which sometimes sets in across the Florida reefs from the Gulf stream, and was not the result of neglect or failure to perform their duty by either officers or crew.

It would certainly be improper either for this or the Circuit Court to set aside a verdict of a jury by giving credence to anything sworn to by persons thus plainly guilty of false swearing. What they swear to in this protest, and what they swear to in this trial, is entirely inconsistent, and for this reason the jury was entirely justified in giving no weight to their testimony in any particular. This leaves the conflict in the testimony to the statements of the mate and the seaman Hitchings. The only inconsistency we can discover in the testimony of the mate is in respect to the weather on the night of the 26th, and about that there is sufficient other testimony to have enabled the jury to form a conclusion. In respect to the testimony of Hitchings, an examination of it will disclose that he makes six feet of water in the pump-well on Monday at eight or ten o'clock, which is inconsistent with the testimony of every other witness. He has the jettison of the timber to occur when six days out; it happened on the third. He makes an average of eight feet water in the hold during the voyage, when, if what Grant and Brown say (that the men were constantly at the pumps, etc.,) is true, there could not have been such an average.

Upon most material questions the testimony of the mate is corroborated by the affidavit of James Davis, the boatswain, who joined in the protest of the Captain. This is a circumstance which the jury had a right to consider.

It was necessary in this case to compare and weigh the testimony of these witnesses. The Circuit Court could not say, under these circumstances, that the jury erred in giving credit to the mate thus corroborated by the boatswain, rather than to two witnesses who had sworn falsely with reference to the incidents of this identical voyage, and to one whose statements bore internal evidence of incorrectness in several

particulars. Even if the testimony of the one witness had been entirely consistent, we cannot see that such a case would be presented as would have required the court below to discredit the action of the jury in believing the mate rather than him, and certainly no case is presented here requiring us to set aside the action of both court and jury.

What we determine in this case is this precise proposition. Where there is a conflict between one witness for the plaintiff and three for the defendant, and the record discloses that two of the witnesses for the defendant had sworn falsely in the precise matter being investigated, and that many of the circumstances which appeared to be true were inconsistent with material facts to which the third swore, and the testimony of the one witness for the plaintiff is unimpeached in any essential particular, and is corroborated by the affidavit of another person, the court should not grant a new trial in case of a verdict for the plaintiff, unless the case presented by the testimony of the one witness for the plaintiff and the other testimony entitled to consideration is such as authorizes such action.

This, therefore, is the inquiry, which disposes of the matter of a new trial, so far as it involves a consideration of the facts of the case.

The first point made by the defendant which we consider is, that in an insurance upon the freight the vessel must be seaworthy for the destined voyage when she sailed, that the evidence discloses that such was not the case, that it is established that this vessel, shortly after sailing, and without encountering any stress of weather, accident or any peril insured against, was found in a condition from which a presumption arises that she was unseaworthy for the voyage when she sailed, that this presumption is not rebutted by the plaintiff, and that for this reason the verdict should have been for the defendant.

In what condition was this ship at the time refered to, and what was the cause of such condition, is, therefore, the

first question which arises upon the testimony. The testimony of the mate, so far as it discloses these facts, must make the case to be considered. According to his testimony, the bark left Pensacola on the morning of the 19th of December; she did not leak before she crossed the bar; she crossed the bar at eight o'clock. The weather continued fair until next day, the 20th. The bark commenced to leak on the 21st in the morning. On the morning of the 21st he sounded the pumps, and found about six feet water in her hold. On the 21st the wind was blowing fresh, weather dark and cloudy, the vessel laboring very heavy; cannot give the exact time the weather described continued—it was between ten and fifteen hours—this was on the 20th. The weather was stated in the log. On the morning of the 21st the crew were called aft by the Captain. He stated the condition of the vessel, and their answer was that they looked to the Captain as their father, and expected he would do the best for all concerned. The men were kept at the pumps at one time three hours, or during their watch, half of the crew.

A part of the deck load, sixteen pieces of heavy timber, was thrown overboard. She became free of water on the 23d in the morning. After the 23d, and up to the time of the loss, she made about eight or ten inches water in twenty-four hours. This witness says nothing as to the character of the weather on the 22d, 23d, and 24th. On the 25th he says there was a fresh breeze. At 12 M. on the 26th he says the weather was fair. At four o'clock there was no breeze, and had no steerage way on the bark from four to six. The weather continued calm until near six o'clock. From six to eight he was below, but the weather was rainy and squally. The weather from eight until she went ashore was rainy and stormy. About ten o'clock the sea was running high, the squalls came on often; they were very heavy, sometimes had to lower the tops down and clew everything up. The

night was dark, the sea at the time we went aground was very heavy.

Henry Filor, of Key West, examined for plaintiff, says he has been on board the bark since she was wrecked; her top works were staunch, strong and solid. Her bottom was out. In speaking of the weather on the night of the 26th, he says it was a heavy gale of wind; a heavy, dark night, raining heavily; wind variable and squally.

James Peat, for defendant, says the wind on that night blew heavily in squalls.

Courtland P. Williams, for defendant, says: when the bark ran ashore the wind was very fresh and squally, a heavy sea heaving in. In the squalls it blew very heavy.

Graham J. Lister, for defendant, says: the wind, on the night of the 26th December, was blowing heavy, with violent squalls, a heavy sea, and the night very dark.

F. Filor says the weather was stormy, and wrecking vessels were out.

Considerable repairs were made on the ship while in port; and the artizans employed in Pensacola in making these repairs on the bark swear that, in their opinion, she was seaworthy for the voyage; that her timbers, so far as they examined them, and to the extent they saw them, were strong and solid. They say, however, upon cross examination, that they made no examination below the water line. An expert swears that he has noticed the drainage from sticks of timber such as were put on the bark, and that he has seen seven feet of water in vessels the size of Schultz, which had slashed into the bow port and from drainage; and that the timber, with which the bark appeared to be loaded, appeared to have been in the water some time.

This, we think, is substantially the testimony in this record, which relates to the subject of seaworthiness, embracing her appearance in port, and extending from the day the bark sailed to the night of her loss. It does not include any statement of Brown and Grant.

Do these facts make such a clear case of unseaworthiness that we should reverse the action of the judge of the court below, in refusing to set aside a verdict of the jury finding the contrary? We have before stated the rule which we think should have controlled the exercise of his discretion in this respect, and the presumption is that he exercised his discretion properly.

The question of seaworthiness is one of fact, the consideration of which is peculiarly within the province of the jury; the effect of a want of it upon a contract of insurance is one of law. Therefore, in stating what we think is a rule of natural presumption as to the fact of seaworthiness, and a rule which should govern a jury in reaching a conclusion upon the subject, we do not wish to be understood as stating a rule of law, except in so far as the law enforces all natural presumptions, and authorizes a court to set aside verdicts contrary to them. The fact here, from which a presumption of unseaworthiness at the time the bark sailed was sought to be generated in the minds of the jury, was the leaky condition of the ship about fifty hours after the vessel sailed. The condition was occasioned by a leak. The simple springing a leak in ordinary weather, shortly after sailing, independent of its effects and character, should not create a presumption of unseaworthiness when the ship sailed. In all cases, however, where the proximate cause of a leak discovered shortly after sailing, and which results in a loss of the ship, or renders her incapable of proceeding on her voyage, cannot be traced to a peril insured against, or ascribed to stress of weather or some accident on the voyage, then a presumption of unseaworthiness, when the vessel sailed, should be generated in the minds of the jury, and unless that natural presumption is overcome by the assured, the insurer should be discharged. In order to create this presumption, the burden of proof of all these facts lies upon the insurer, for in the absence of testimony the ship is presumed to be seaworthy.

We do not intend by thus stating what should be a natural presumption in a case where the leak resulted in a loss of the ship, or made it necessary for her to discontinue the voyage, to say that it is not possible for the evidence to disclose such a state and condition of the ship shortly after sailing as would justify and require the jury to conclude that there was unseaworthiness when she sailed, although the condition thus disclosed was not the proximate cause either of a loss of the ship or of her failure to make the intended voyage. The question is as to the fact: Does the evidence disclose such facts as establish the conclusion that the vessel when she sailed was not in a condition to encounter the ordinary dangers of the voyage, the dangers not insured against? The bark not having been prevented from pursuing her voyage, and not having been lost through this leak, as the proximate cause of the disaster, those cases which decide that from such circumstances a presumption of unseaworthiness arises, are not strictly applicable to this case. It may be admitted that the effect of such facts is as defendant contends, and it does not affect this case. The question here is: What is the effect of the facts which the jury had a right to infer, or which the testimony tended to prove?

Viewed in this light, what was the character of the leak in this case? We have no subsequent examination disclosing its locality in the ship. We do not know the exact time that it commenced. The bark did not leak before she crossed the bar; she crossed the bar about nine o'clock Sunday morning, and the leak was not discovered until Tuesday morning. We do not know the proportion in which the volume of water going into the ship increased or decreased during this period. When the leak was discovered there was six feet water in the vessel; she could have been taking in this water from Sunday at eight or nine o'clock until Tuesday morning, say forty hours; during this time the leakage, which some experts declare often happens in the best of vessels at the commencement of the voyage, and

that which was incident to the drainage of the cargo—timber saturated with water—happened. In addition to this, and before the leak is discovered, the vessel encounters fifteen hours of weather, described by one witness as weather during which the wind was blowing fresh, the weather dark and cloudy, with a heavy sea, causing the vessel to labor very heavily ; and by another—and a witness for the defendant—as a squall and wind. When the leak is discovered, the men are called to the pumps ; at one time, on Tuesday, they are kept at the pumps three hours, or during their watch. In addition to this, sixteen pieces of heavy timber are thrown overboard. On the next day she becomes free of water, and up to the time of her loss, five days thereafter, she made about eight or ten inches water in twenty-four hours. During a portion of the last twenty-four hours of the voyage she encountered weather described by one witness for the plaintiff as a heavy gale of wind, by one of defendant's witnesses, as "squally weather, blowing heavily in the squalls" ; by another, as "fresh and squally, a heavy sea heaving in, the wind about a reefed topsail breeze for a ship going to windward, in the squalls blowing very heavily." In addition to the use of the pumps, the evidence discloses that sixteen pieces of heavy timber were thrown overboard on Tuesday, the 21st. This may be thought to be evidence of an overloading of the ship, by which we mean a load beyond her tonnage or capacity ; but here we are met by the direct and positive testimony of the stevedore, who supervised the loading, that she was not overloaded, and that in this respect everything was proper. Our attention in this connection has been called to the remark of Mr. Justice Radcliff, in Abbott vs. Broome, 1 Caines, 302, to the effect that " a vessel is not seaworthy unless she be in a condition to carry a full cargo." The question there was not a general question of seaworthiness, and the remark should be limited to the particular subject under consideration, " the question being whether the vessel was seaworthy for the purpose of

carrying to New York a cargo brought from India. It is a compliance with this warranty if the ship is in a suitable condition to carry the cargo put on board or intended to be so, it being sufficient if the vessel is fit for the service in which she is employed." 1 Phillips on Ins., 114.

We have searched in vain to find a case of this character, a serious leak remedied by the action of the pumps and by a jettison of a small portion of the cargo. We are clear that a leak, which is remedied by the action of the pumps, is not sufficient to rebut the ordinary presumption of seaworthiness in a case where all the direct and positive testimony is to the effect that the vessel was seaworthy. In this case repairs were made while in port; all the artisans employed on the ship testify that her timbers, to the extent of their examination, were sound and solid. It is true that no repairs were made below the water-line, and they are unable to speak as to the condition of her garboard streaks and like matters; but if, in a general examination of her upper works and of the timbers immediately connected with the repairs made, they find them firm and solid, the conclusion that those below the water-line were in like condition cannot be called an inference in no degree sanctioned by the testimony.

In addition to this is the testimony of one witness, who visited her after the wreck, to the effect that her upper works were sound and solid.

As to the matter of the jettison. A ship having on board nothing more than a cargo corresponding to her capacity, should be able to encounter ordinary weather without a jettison of her cargo—certainly without a jettison of any considerable portion of it. Seaworthiness implies an ability and sufficiency to carry the intended cargo to the port of destination. If this is true where the insurance is as to the ship, it should unquestionably be true as to freight to be earned by carrying the cargo, which is this case. A necessary jettison shortly after sailing with a proper load, without

Henry Schultz v. The Pacific Insurance Co.

encountering any peril insured against, is a fact tending to generate a presumption of unseaworthiness when the ship sailed. We have seen that no peril insured against was encountered. What was the jettison here? It was sixteen pieces of heavy timber. The bill of lading shows the cargo to have consisted of 1208 pieces of timber. The term "heavy" is very indefinite, and the only facts disclosed by which any comparison can be made is the number of pieces thrown overboard and the number constituting the entire cargo. If it be considered that they were of the average weight, we have a jettison of less than one-seventieth of the cargo; but there is not a particle of evidence by which we can estimate accurately the weight of the pieces jettisoned or of any of the other pieces, and we cannot say with any reasonable certainty what its weight was. Even if the weight was given, in the absence of testimony of an expert, any statement by the court as to its effect in elevating the topside of the ship, or its effect upon the leak, would be a judicial assumption of knowledge in matters of nautical science.

Was this a *necessary* jettison? for an unnecessary jettison cannot be evidence of an incapacity to carry the cargo on board. We are unable to determine this question with such satisfaction and clearness as should exist to justify us in controlling the discretion of the court below in the matter of granting a new trial. The evidence is wanting in that certainty which would enable even an expert to form or express an opinion. Could he determine with any reasonable certainty that a jettison was necessary, without having some definite idea as to the amount jettisoned, in a case where the leak is remedied, not by the jettison alone, but by it and the combined action of the pumps? The capacity of the pumps, a definite knowledge of the history of the decrease of the leak, the weight of the cargo jettisoned, and many other matters, would constitute elements in the formation of any clear judgment upon this subject. These facts are

not disclosed, and the burden of proof is upon the defendant as to all of them. He must prove the necessity of the jettison, or it must appear from plaintiff's evidence; here two of his witnesses are entitled to no belief at all, and the other does not detail the facts, and to the extent that he relates facts, and his statement is in conflict with that of the mate, we cannot say to the jury, under the circumstances, that they should have believed him rather than the mate. Here we have one effect produced by two causes, either cause being of a nature to produce the effect. In a case where the evidence as to one of the causes of the jettison is of the character here indicated, can we say with reasonable certainty, against a verdict of a jury and the action of the court, that the existence of this cause was necessary to produce the effect? While we cannot say that we are entirely satisfied with the verdict, yet we can not set it aside for this cause, under these circumstances.

The plaintiff in this case was the master of the bark, and two-thirds owner thereof. In addition to the matter of unseaworthiness, the insurer plead that the loss was occasioned, not by a peril insured against, but by the unskillful navigation and gross negligence of the assured himself. He also plead that the master designedly cast away the bark. It is insisted that the evidence establishes both or one of these pleas, and that the verdict of the jury should have been set aside by the Circuit Court for that reason.

The direct and proximate cause of the loss of the bark was stranding on the American shoals during a gale, and in waters in which exists a current, the course and velocity of which varies. This is a peril of the sea. The general rule where barratry is excepted from the risks, which is this case, is that if the immediate cause of the loss is a peril insured against, it is no defense that the loss was remotely caused by gross negligence of the agent of the insured not amounting to barratry. This is the law as settled repeatedly by the Supreme Court of the United States as well as by the

Henry Schultz v. The Pacific Insurance Co.

Court of King's Bench. 3 Pet., 222; 10 Pet., 507; 11 Pet., 213; 3 Sum., 276; 5 Barn. 3 Ala., 171.

The pleas here are, however, that the efficient cause of the stranding was either the gross negligence or design of the assured himself. The underwriter is not liable to indemnify the assured for losses by the perils insured against directly incurred through the frauds or gross misconduct of the assured. Where a loss by the perils insured against may have been remotely occasioned by the fault, or negligence, or want of the greatest degree of vigilance, prudence and forecast of the assured, and yet, without his being at all aware of such consequence, there are not wanting authorities establishing the liability of the underwriters to make indemnity. This liability undoubtedly does not extend beyond the *bona fide* acts of the assured, nor does it extend to all *bona fide* acts. This is the language of Mr. Phillips upon this subject. 1 Phil. on Ins., 3d ed., 589. Mr. Arnauld, in his work on Insurance, 2 Arn., 777, says it is not every mistake in judgment on the part of the assured that will discharge the underwriter, although such mistake may have immediately brought about the loss. If the assured acted, though erroneously, yet with reasonable prudence, and a *bona fide* desire to do the best for all concerned, the insurer will still be liable.

The following is a condensed statement of the evidence applicable to these pleas, and we must analyze it to determine the character of the act established by it:

Mate.—From six to twelve A. M. of Dec. 26th, we were steering in an easterly direction about E. to E. by N., went about thirteen to fifteen miles in four hours, from 8 to 12, allowing one and a half knots for current in an easterly direction. At 12 our latitude was 24 degrees 8 minutes, our longitude 81 degrees some minutes, about forty-five miles from the Florida coast. [From 12 to 4 neither this nor any other witness gives the course of the vessel, and her course can only be determined by taking her position at 12 and 4

o'clock.] At four o'clock I saw a light which bore due north, the vessel then heading N. by W. It was an iron screw structure painted red, the lighthouse being red and the top white. It was about ten miles off. Did not notice land inside of the light. Had no wind at four, the weather was hazy and thick, there was a squall coming in an easterly direction. [The mate does not speak with great accuracy as to circumstances between four and six.] What he says is that before six, vessel was heading N. N. E., was then on port tack, went about at six; the weather continued calm from four to six. What wind there was was from southward and westward. Had no steerage way on bark from four to six. At six he says a breeze sprung up with a squall from eastward, and that he saw a light about thirteen miles distant bearing N. N. W. one-half N., which he took to be Sombrero light. The vessel was heading N. E. by N. From about six to eight I was below. The weather during that time was raining and squally. Came on deck at eight, saw no light then. The vessel was heading at eight o'clock E. N. E., she was then on the port tack. After she came about, her course was N. E. by E. The wind was about S. S. E. The vessel was on the wind going about two knots an hour, after she went about, she was now on the starboard tack, she continued at that rate about three-fourths of an hour about quarter to nine o'clock. The wind then shifted more to eastward and the sails fell back. I then put her on the port tack. The weather was squally, the wind so variable that I could not tell the exact course; thought it about N. E. This continued about one or one and one-half hours. She made about three or four miles from eight to ten; judged the course to be a north-easterly direction. My watch was from eight to twelve. I changed her course very often during my watch. She was sometimes to eastward, sometimes to north, according to direction of the wind. Between eight and twelve, the wind was from all directions, from N. E. to S. E. in general, and from eight until she went

ashore was rainy and stormy. At ten a steady breeze sprung up from N. by W. Between ten and until she struck, wind sometimes N. N. W., sometimes N. one-half W. At ten she was on the port tack heading N. E. by E. The sea was running high from northward and eastward. Bark went about four and one-half or five knots per hour from ten until she struck. Towards ten I saw a light, while up in the mizzen, with a glass, thought it the same light seen at six; from the bearing, took it to be Sombrero light; it bore W. by S. It was only visible at times; this time I could not estimate the distance, as the weather was thick. It was a bright light and appeared to be fixed, took it for a fixed light. The vessel struck near twelve o'clock at night. When she grounded was on the port tack, course N. E.—another place N. E. one-half N. Went about four or five knots per hour from ten to twelve. Wind about N. by W. or N. N. W., with a heavy sea from N. E.

Hitchings.—This witness says that during the day, on the 26th, the wind and weather was fair. Does not know the course of the vessel. That between seven and eight o'clock a light was discovered. At nine another light was seen; one was a revolving, the other a fixed light. Thomas Brown first saw the light. Heard the Captain call their names when he got ashore. Can't say how they bore, the course of the vessel, or how far the lights were off. He says the weather at night was squally. Bark struck at about quarter to twelve o'clock at night..

Brown.—Land was seen just before dark. Weather was variable and light, with rain all the voyage, up to when lights were seen. Light was seen about "dawn of evening—about dark." Was not on deck when lights first seen; lights bore on the weather bow when first seen. About a quarter to eight I saw two lights, one revolving, the other fixed. This was about three and three-quarter hours before bark went ashore. Captain told me the names. When I first saw them they were abeam of the ship on the weather bow, and when going

out of sight, about one and three-fourths hours before bark went ashore, were upon the port quarter. Course of vessel at quarter to eight was N. N. E. [In two other places says it was N. E.] Wind, when bark passed revolving light, was N. N. W. Saw the lights up to quarter to ten. Wind, when passing the lights, was S. W. Vessel struck between half after eleven and twelve.

Grant.—The wind was fair and the weather light up to seeing light houses. Bark struck about twenty-five minutes to eleven. Saw a revolving light about five hours before, about twenty-five minutes to six. It bore to westward and northward pretty much ahead of the bark about ten miles off. It was Sand-Key light. Course of vessel about S. E. at the time. In another place, when lights first seen, bark heading N. W. Heard the Captain give the course S. E. to the man at the wheel. Wind while the lights in sight about S. W. A squall was making ahead. Captain first discovered the lights. Both Sand-Key and Key West lights in sight about four hours before she struck. Key West light bore about N. W. about thirteen miles off. The night was very dark. No moon, weather cloudy and squally. Vessel struck about twenty-five minutes to eleven. Her course then about S. E. Wind from S. W. She was close hauled and on port tack when she struck.

Protest sworn to by master, mate, boatswain, and the two seamen, Grant and Brown:

"That the loss of the bark was owing immediately to adverse winds, heavy, squally and foggy weather, and a strong, adverse current, which it is said sometimes sets in across the Florida Reef from the Gulf Stream."

*Evidence as to Weather.*—One Witness for the defendant says the wind blew heavily in squalls; another that the wind was very fresh and squally, a heavy sea heaving in; another that the wind was blowing heavy, with violent squalls, a heavy sea, and the night dark, that the wind was about a reef-topsail breeze for a ship on the wind, but in the

squalls it was much heavier. The mate says that from six to eight the weather was rainy and squally, and that from eight until she went ashore was rainy and stormy. About ten o'clock the sea was running high; the squalls came on often; they were very heavy; sometimes had to lower the tops down and clew everything up.

Another witness says the weather on that night was a heavy gale of wind, a heavy dark night, raing heavily; wind variable and squally. Another that the weather was stormy, and wrecking vessels were out.

Filor.—I have navigated the waters in which the bark was lost nineteen years. The velocity of the current, which exists in these waters, varies; there is no man living there, who can give a correct account of the current; it varies from the eastward to the northward, northward and westward; sometimes no current at all, at others about five knots. Upon being asked to state the course of the current on the night of the loss of the bark, with the wind in the direction it was, he answers: It is beyond my knowledge, and could not be told by any one raised there; it is beyond any man's knowledge to tell anything about the current; in general it is a subject of dispute.

F. Filor.—Sombrero light can be seen seaward from eighteen to twenty miles, Key-West light about fourteen, and that Sand-Key light may be seen from ten to fifteen miles in bad and thick weather. The reflection from Sombrero and Sand-Key might be seen on a very clear night from the American Shoals. There is also in evidence a chart of the Straits of Florida.

If the mate's testimony gives the bearing of the light seen at ten, as well as the course of the ship and the direction of the wind at that hour, it follows that, if the light seen was Key-West light, a bearing of west by south would place the ship inside the reef at that time. If it was Sand-Key light, then the ship, if she was ten or fifteen miles from the light, with a northeast by east course, would be on a course which

if continued a few miles, would carry her on the reef at a point in the vicinity of American Shoals. If it was the light on Sombrero Key, which the mate says he thought it was, then a northeast by east course would not have carried her on the reef, and would not have placed her where she grounded, unless instead of going forward in a northeast by east course ten miles as he supposed, she went backward in a west by south course about forty miles around or through the reefs in two hours. The result of this is that, if any light was seen at ten o'clock, and there was no mistake in the bearing, it was impossible that the light seen could have been either Key-West light or the light on Sombrero Key, and that it was probably Sand-Key light.

What Hitchings says in this connection amounts to little. He knows nothing of the course of the vessel, the winds or bearings of the lights.

From Grant's testimony no very satisfactory conclusion can be drawn. He says the bark's course at six or seven o'clock, while both lights were in sight, was southeast, and the wind southwest, and that when she ran ashore, about four hours afterwards, according to his estimate, her course and the direction of wind were the same. He says nothing about the course of the vessel or wind during the four hours. All that can be said of this testimony is that if this vessel had a southeast course and a southwest wind for any considerable time before she went ashore, her going ashore could not be attributed either to neglect of the master in taking proper precautions to keep her off the shore, or to any design to place her there. She must have gone to the northward under these circumstances to get ashore, and unless there were some very extraordinary current operating, her going in that direction, under such circumstances, would be impossible.

The testimony of Brown is that the lights went out of sight about one and three-quarter hours before the bark went ashore; that when going out of sight they were upon

the port quarter. The lights seen, he says, were Key West and Sand Key lights. The difficulty in this testimony is that the course of the vessel is not given for such a length of time as to enable you to make any safe calculation. The point at which the lights went out of sight is not readily fixed, and the precise course of the vessel is given only at quarter to eight o'clock, which was N. N. E. There are some legitimate inferences to be made, however, from Brown's entire testimony. If the lights went out of sight on the port quarter, the bark's course ought to have been somewhere between east, northeast, and north by east. Now a north by east course would, in all probability, have caused her to strike the reef, but an east, northeast, or northeast by east course would not have put her on the reef where she struck. An east northeast course would have been a course about parallel with the reef. A northeast by east course would have been a course for Sombrero light, and the bark must have come in sight of this light before striking the reef, thus enabling her to shape her course with certainty. Again, if we consider the mate's and Brown's testimony together upon the hypothesis that the light seen was Sand Key light. The mate testifies that at eight, when he came on deck, the vessel was on the port tack heading about east northeast. That about eight she came about and her course was northeast by east. Now the course given by Brown, at a quarter to eight, corresponds to some extent with the course given by the mate when he came on deck at eight. If the ship's course is continued by the mate upon the hypothesis that the Sand Key light was seen at eight, we find this: That at eight the bark came about and went for three-quarters of an hour on that course, at the rate of two knots. From this testimony her position would be at this time about eighteen miles east by south of Sand Key, and about ten or twelve miles to the southward of American shoals. The mate says that the wind at this time shifted to the eastward, that he then put her on the port tack, that the weather

was so squally and the wind so variable that he could not tell her course for sometime. He thought it, however, about northeast. This course would have her heading toward Sombrero Key, about twenty-five miles distant. This, he says, continued about one and a half hours, but that he made only three or four miles from eight to ten o'clock. With this he could never have seen Sombrero light at ten with a bearing of west by south, nor could he have seen Sand Key light at ten with this bearing. It is not a violent inference from the testimony of Brown and the mate, viewed in this aspect, to place the vessel at ten at a point southwest by west of Sombrero Key about twenty miles, and about east of Sand Key twenty-four miles. At ten the mate has the bark heading northeast by east. This course would not have put her on the shoal from this point, but would have carried her a few miles to the southward of Sombrero Key. The mate says she was on a northeast course when she struck. We cannot see how this course, with a wind north northwest, or north half west, could have placed her on the shoal. With either of them he must have soon come in sight of Sombrero Key light, and thus been able to fix his position with some certainty.

These inferences are based upon the course of the ship, bearings of the lights, and the distances made as given by the testimony; calculations which any one with a chart can readily make. No estimate of the influence of the current or the effects of the adverse winds prevailing is made, and we cannot from this testimony form any definite opinion upon these subjects.

The defense is negligence of the master, and a different rule of law is applicable to his negligence than would be applicable to negligence of the other officers or crew, which the master could not be expected to prevent with ordinary prudence and care. Now it is not established by this testimony that the master had anything to do with the changes made in the course of the vessel between the hours of eight

and twelve, and while the general presumption is that the master of a ship directs her course, and it is his duty so to do, yet in this case there are facts in the testimony which indicate a change of course by the mate between eight and ten o'clock without his sanction. The master was below when the vessel struck, and the jury had a right to infer that he was below during the mate's watch, as there was no evidence of his being on deck. The master may have left the deck at eight with an east northeast course, which was a course about parallel with the reef. She soon came about, and her course was then northeast by east, according to the mate, which was a course not calculated to place her upon the reef from her then position. If the current was to the eastward, its usual course, then its tendency would have been to carry her from the shoal, and such also would have been the tendency of a northwest wind. Now all that can be said of this testimony is that, giving it the most reasonable construction that can be given, the shoaling of the ship does not appear to be a natural result following from it. This negatives any idea of design. But it is said that as the courses thus given do not account for the ship's shoaling, therefore there must have been gross negligence in the navigation; if the courses did not place her there, then we have gross negligence established; if they did, then there was design. The proposition is too broad; you must prove some act of negligence.

There are some statements of the seamen to the effect that the captain, after the stranding, expressed a desire that the bark might break in two, and one of them states that he heard the captain, on the night of the shoaling, at about 8 o'clock, say to the mate, "Here is my course, but I will put her in here." This is all he appears to have heard of the conversation. If the jury came to a conclusion in this case based upon a general view of the facts of the case, either rejecting this evidence or giving it a favorable construction,

their action in this respect affords no ground for setting aside the verdict.

This matter must be solved by the application of the rules of evidence to this testimony. Where the assured establishes a loss and shows that the direct and proximate cause of it is a peril insured against, then the insurer can relieve himself by showing that the efficient and direct causes of encountering the peril was the failure on the part of the assured to act in good faith toward the insurer, or to exercise ordinary prudence in the management, navigation and care of the vessel. The insurance here is upon the freight. The insurer engages that fortuitous dangers shall not prevent the voyage and earning of this freight, provided due means are used by the assured to attain that end. When this duty and this due means are neglected, the assured discharges the insurer from the direct consequences of such neglect, and takes upon himself the risk incident to his negligence or misconduct. Judge Story, in delivering the opinion of the court in Columbia Insurance Co. vs. Lawrence, 10 Pet., 507, remarks that a loss by fire, occasioned by the mere fault and negligence of the assured, or his servants or agents, and without fraud or design, is a loss within the policy. This doctrine was also announced by the Supreme Court of New York, in 16 Barbour, 127. These are both cases of insurance against fire on land.

Our examination of the case in the Supreme Court of the United States does not disclose that the neglect of the assured himself was set up as a defense in that case. However this may be as to fire insurance upon land, the elementary writers, Phillips and Arnauld, upon the subject of marine insurance state the rules as we have quoted them. This seems to be the view of Lord Mansfield in the case in 1 Burr, 341, where he states the general rule as to risks taken by the insurer. It is the view of Lord Ellenborough, as expressed in 1 Camp., 436, and it is the rule announced in 20 Wend., 303, and 26 Wend., 581. Chief Justice Marshall, in

Henry Schultz v. The Pacific Insurance Co.

the same case where Mr. Justice Story announced the rule above stated, says : " Generally speaking, insurances against fire are made in the confidence that the assured will use all the precautions to avoid the calamity insured against which would be suggested by his interest." 2 Pet., 49. Certainly an assured's interest, as a general rule, would suggest ordinary care and prudence. See also Chan. Kent's views in 1 Caines' Cases in Error, 11; also 3 Kent's Com., 300; 5 Hammond, 435. In addition to these authorities, the rule we announce is the only one consistent with the general principles incident to the contract in other respects. The implied warranty of seaworthiness requires at the hands of the assured such a degree of care in the selection of his officers and crew as is necessary to obtain competent persons, and the principle extends to many other matters embraced in the contract.

There is no doubt that the burden of proof is here upon the underwriters. This negligence must appear from the plaintiff's case, or defendant must prove it. The presumption is with the assured, after proof of loss. 4 Mason, 441; 12 Wheat., 383; 45 R., 37; 4 Camp., 234; 1 Burr, 347.

In this view, what is the present case? Unless we are prepared to say that so shaping the course of the vessel upon this voyage as to come in sight of the lights in the Straits of Florida establishes such neglect, want of care, or bad faith upon the part of the assured as excuses the insurer, we cannot disturb the verdict. This we cannot say. The lights are placed there to be seen, and as points of departure for the voyage up the Atlantic. The evidence shows the existence of adverse winds and stormy weather upon the night of the shoaling, as well as the existence in these waters of a current whose velocity and course varies.

In the absence of any satisfactory proof showing negligence or design as the direct cause of the shoaling, we cannot disturb the verdict.

The questions of seaworthiness and care in the navigation

of this ship just disposed of are, in the language of Mr. Justice Story, "questions of fact, dependent upon nautical testimony, and are incapable of being solved by a court without assuming to itself the province of a jury, and judicially relying upon its own skill in maritime affairs." McLanahan vs. the Universal Ins. Co., 1 Peters, 184. The Supreme Court of the United States will not control the discretion of the court in the matter of refusing new trials in such cases, and is thus relieved of the responsibility of considering conclusions reached by juries in such matters. Here the statute makes it our duty to do so. We refer to the remark of Judge Story to indicate to counsel the very great propriety of settling questions of nautical science by the testimony of experts in that science. Their opinions are, certainly, more satisfactory than the opinions of persons not thus skilled. When parties upon either side neglect to produce such testimony, all unfavorable consequences resulting from its absence must be attributed to their own acts.

The next point arising upon the testimony which we consider is, that the evidence discloses that at the time the contract of insurance was entered into, a large part of the freight to be earned had been paid to the plaintiff—that the amount of freight at risk was less than that covered by the policy, and that the verdict for the full sum is erroneous. Under the terms of the charter party, as well as the contract endorsed on the bill of lading, the moneys paid to the master were advanced against the freight, and were to be deducted therefrom. This is also a valued policy. The general rule is, that the insurable interest of the owner of the vessel extends to the whole amount of the freights to be earned by the voyage; and when its value is fixed by agreement, that is conclusive in the absence of fraud. Does the fact that he has pledged it to a third party as a fund from which to redeem a loan, giving him a lien upon it, change the rule? Under such a contract equities as to the freight arise in favor of the party making the ad-

Henry Schultz v. The Pacific Insurance Co.

vances, and he may have an insurable interest to the extent of his loan, but it does not follow that the insurable interest of the owner is diminished to the extent the freight is pledged. One who has pledged or mortgaged his interest in the ship, even to the extent of its full value, has still an insurable interest to the full value. 1 Phillips, 41; 2 Pick., 258. In this case there is a pledge of freight to be earned. The same rule which permits a mortgagor of the ship to insure for its full value, must permit a party receiving a loan or advance against the freight to insure that freight. The effect of this pledge of the freight is not relief from the debt, in case the freight is not earned, in the absence of a stipulation to that effect. Whatever doubt may have existed in England upon that subject, the doctrine in this country is that "if freight is paid in advance, and the goods be not carried by reason of any event not imputable to the shipper, it is to be repaid, unless there be a special agreement to the contrary." 3 Pick., 20; 11 Mar., 360; 3 Kent's Com., 227; 3 Sumner, 66. We have no doubt of the owner's insurable interest to the full amount of the freight, notwithstanding an advance to be charged against it.

It is alleged that there was concealment in reference to the condition of the ship at the time the policy was applied for. This is a matter to which the implied warranty of seaworthiness extends, and the assured is not obliged to communicate any fact as to which there is a warranty express or implied, unless information upon the subject is particularly called for in the first instance. 20 John., 214; 4 East., 590; Annesly on Ins., 143; 12 Maryland, 343.

The Judge charged the jury in this case as follows: "If you find, from the evidence, that the master of the Mutter Schultz designedly cast away and destroyed his vessel, you must of course find for the defendant. In determining this question you must be satisfied beyond a reasonable doubt that the master did designedly cast the vessel away before you can find against him on this point."

This charge was excepted to, and is assigned here as error.

This defense involves a serious charge affecting the character of the master. It is a crime. It is not denied that this would be the rule if this was a prosecution of a criminal character. Does the fact that in this case the question arises simply as a defense in a matter of civil contract vary the rule as to the degree of proof which should be required? Now, the fact to be proved, whether its proof be in a civil or criminal case, is the same—the casting away of the ship by design—and the rule is that the same amount of proof which exists in one case must exist in the other—that is to say, the conclusion to be established cannot be inferred from one state of facts in a civil case, and another state of facts in a criminal case. The reason why strict proof is required is not that the one case or the other is civil or criminal, but because the nature of the conclusion to be reached in each case is of such character as the law requires strict proof to establish it. The rules of evidence are the same in civil and criminal cases. Green. Ev., 10 ed., par. 65; Abbott, J., in 2 Starkie, 116. "A fact must be established by the same evidence, whether it is to be followed by a civil or criminal consequence." 2 Russell on Crimes, 589.

The cases upon this precise point do not entirely coincide. In Thurtell vs. Beaumont, 1 Bing., 339, the defense was that the property insured was wilfully burnt by the plaintiff himself. The Judge directed the jury that "before they gave a verdict against the plaintiff, it was their duty to be satisfied that the crime of wilfully setting fire to the premises was as clearly brought home to him in this action as would warrant their finding him guilty of the capital offense, if he had been tried before them on a criminal charge." Mr. Justice Slidell, in 1 La. Ann., 219, speaking for the Supreme Court of Louisiana, says: "We think that the jury should not have been instructed to require the same full proof to discharge an insurer as would be necessary to convict the assured. The position of the claimant in the one case and

the prisoner in the other are not identical." The same court, however, in a subsequent action upon a policy of insurance, held that "where a criminal charge is to be proved, the proof ought to be not only consistent with the prisoner's guilt, but inconsistent with any other rational conclusion;" and although it was a civil proceeding pending, the court applied this rule. The decisions upon the precise point, therefore, establish the rule to be, that the character of the fact to be proved, and not the position of the party, determines the degree of proof to be required. There was no error in this direction of the court.

The only error assigned remaining to be considered is, that the court entered judgment upon a verdict which was illegal and insufficient.

The verdict was in these words: "We, the jury, find for the plaintiff, and assess the damages at six thousand dollars, with interest from the commencement of this suit at legal rate." There is no difficulty in the clerk's calculating the interest from the date of the commencement of the suit to the date of the verdict; the periods are fixed by the verdict. There is no difficulty as to the rate. There were no issues in respect to interest, and interpreting the verdict with reference to the issues, the necessary conclusion is that the interest is at the rate prevailing in the jurisdiction of the Court. The general rule is, that a verdict must convey on its face a definite and precise meaning, and must show just what the jury intended. If there had been issue here as to the rate of interest, or any question of this character, such an issue would not have been determined by the verdict, and in such a case there might have been doubt as to the intention of the jury. In this case we think there is none, and that their conclusion is expressed with sufficient certainty to justify a judgment thereon.

In leaving the matter discussed in this appeal, we remark that among other things wanted, the case stated is not signed

9

or verified by the judge. This is a fatal defect. The only thing which gives verity to the correction and settlement of a case in this Court is the signature of the judge. 32 Rule of Practice Circuit Courts.

The judgment is affirmed with costs.